Filed 7/2/19; Certified for Publication 7/24/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>OCCIDENTAL COLLEGE,<br><br>    Defendant and Respondent. | B282292<br><br>(Los Angeles County<br>Super. Ct. No. BS150532) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Werksman Jackson Hathaway & Quinn, Mark M. Hathaway and Jenna E. Eyrich for Plaintiff and Appellant.

Epstein Becker & Green, Jonathan M. Brenner and Susan Graham for Defendant and Respondent.

————————————

# FACTUAL AND PROCEDURAL BACKGROUND

John Doe (Doe) appeals from the judgment of the trial court denying his petition for writ of mandate. (Code Civ. Proc., § 1094.5.) He sought to set aside his expulsion from Occidental College after an outside adjudicator found he had sexually assaulted and engaged in non-consensual sexual contact with Jane Roe (Roe), another student. Doe contends he was denied a fair hearing and the decision was not supported by substantial evidence. For the reasons given below, we affirm the judgment.

I.     Occidental's sexual misconduct policy

Occidental has a comprehensive policy (the policy) that prohibits "all forms of . . . misconduct, including . . . sexual assault" and "[n]on-[c]onsensual [s]exual [c]ontact." The policy, which applies to all members of the Occidental community, defines these terms and explains the concepts of consent and coercion.

Occidental's policy contains thorough procedures for adjudicating policy violations. Upon receipt of a report of a potential violation of the policy, Occidental may impose reasonable and appropriate interim measures to eliminate the hostile environment and protect the parties. Such measures include a campus-wide "[s]tay-[a]way [l]etter," changing class schedules, and an interim suspension.

With a sexual misconduct report, Occidental's Title IX team conducts an "Initial Title IX Assessment." Occidental gathers all of the relevant facts and determines whether to pursue an informal resolution, or whether there is sufficient information to refer the report to a hearing panel for disciplinary action in a formal resolution format. Occidental notifies the respondent, the

2

alleged perpetrator, when it seeks action that would have an impact on the respondent, such as protective measures that restrict his or her movement.

If the Title IX team concludes that disciplinary action may be appropriate, Occidental initiates an investigation, by either an Occidental employee or an external investigator. The investigation "will typically include interviews with the Complainant, the Respondent and any witnesses," and the gathering of any documents and other evidence. The policy requires the investigation be "thorough, impartial, and fair" and "designed to provide a fair and reliable gathering of facts" under "principles of fundamental fairness and respect for all parties." All individuals in this investigation, including the respondent, are to be treated with "appropriate sensitivity and respect."

The investigator prepares a written report, based on which the Title IX team and hearing coordinator will "make a threshold determination as to whether there is sufficient information upon which an adjudicator could find a violation of this policy." When an adjudicator could find a policy violation, Occidental may institute formal resolution proceedings against the respondent involving a hearing before either a faculty panel or an external adjudicator.

The hearing coordinator sends a written notification letter to the respondent containing a brief summary of the conduct at issue and the specific provision of the policy violations that are alleged to have occurred. The hearing coordinator also schedules separate meetings with the parties to explain the hearing process and to answer questions. The parties may review all investigative documents "at least five (5) business days prior to the hearing." At the hearing itself, the parties may call all non-

character witnesses who were interviewed by the investigator, make oral or written inquiries of the investigator, and address outstanding factual issues.

The adjudicator determines responsibility by a preponderance of the evidence and recommends appropriate sanctions to the hearing coordinator. The respondent may appeal the final outcome to an impartial decision-maker.

II. The sexual misconduct allegations against Doe and the interim measures

The administrative record shows that Roe, a freshman, reported to Occidental's Title IX office an incident of sexual misconduct by Doe, a junior, that occurred on September 28 to 29, 2013. Roe asked for a stay-away letter. On October 28, 2013, the dean of students issued Doe a stay-away letter instructing him to refrain from approaching Roe, or from calling, texting, communicating with, or sending her messages.

The following day, Doe went to the dean of students' office who directed him to Nadia Palacios (Palacios), the coordinator of Occidental's Project Sexual Assault Free Environment (Project SAFE), a victim's advocacy center. Doe and Palacios recognized each other because Doe had heckled her during a Project SAFE presentation a month earlier. Palacios told Doe that she was a survivor advocate only and repeatedly directed him back to the dean of students or to the Title IX office. Doe "smirked" at Palacios and complained about the stay-away letter, asserting that Occidental appeared to accept Roe's account of events and to take his version less seriously. Palacios explained that her office was duty-bound to accept a complaint at face value and then to investigate. Nevertheless, Doe continued to talk. Palacios eventually calmed him down. But, as he stood up to leave, Doe

4

saw an educational poster debunking "rape myths" and became visibly angry. He yelled at Palacios loudly and aggressively for 10 minutes that " '[t]hese girls wear whatever they want and they tease us all night and they expect us not to get anything;' " " '[t]he girls owe him something;' " and " '[n]othing ever happened that night. I don't even know this girl.' " Doe was "very emotional and vented." Palacios felt threatened by his conduct, although Doe never explicitly threatened her.

Doe's outburst was overheard by Kristofer Montoya, a student leader and captain of the men's basketball team who was doing homework at Project SAFE that day. Montoya related that Doe told Palacios " '[t]here were no bruises, I didn't hit her or anything . . . so that's not rape, that's not sexual assault.' " Doe insisted that the accusations against him were ridiculous, unfair, and unbelievable. Doe asked, "[i]f she goes back to the room and entices me all night, how can you expect me to think nothing's going to happen?" Doe declared that "[m]en are the victims because they are not expected to do anything at the end of the night."

After Doe left Project SAFE, Palacios called campus safety officers to report the incident. She called Roe to warn that Doe was upset by the stay-away letter. She also emailed the dean of students to report Doe's conduct.

III.    Roe's complaint against Doe

In the days and weeks following the incident, Roe discussed it with her friends. Roe told three friends that Doe penetrated her vagina with his penis and that she kept telling him she did not want to have intercourse; she told him to stop and he kept trying to have sex with her. She told one friend that Doe was aggressive and manipulative. She related to another friend that

5

she informed Doe that she was a virgin and did not want to have sex with him, and that Doe agreed that the two would watch movies and hang out. She also told that friend that Doe would not let her leave his room. Her friends indicated that Roe appeared upset about what had happened with Doe, and that Roe was initially uncertain whether what happened constituted sexual assault. One friend, who had received sexual assault training, told Roe that what she described was sexual assault and arranged a meeting between Roe and Palacios.

Roe also told her Residential Advisor Tess Langseth-DePaolis (Langseth-DePaolis), and Professor Shanna Lorenz (Lorenz) about the incident, using the word "rape" to describe what happened to her. Roe told Langseth-DePaolis that she was a virgin and did not want to have sex, but that Doe was "very pushy and kept pushing and kept kissing and kept touching" Roe until they had sex. Roe told Lorenz that she "tried to get out, but she was dragged back into the room by [Doe]."

Two days before her meeting with Palacios, Roe experienced non-menstrual related vaginal bleeding and irritation and went to Occidental's student wellness center to request pregnancy and STD tests, and a PAP smear. The staffer who performed the latter two tests was unavailable. Roe was very upset that the vaginal bleeding meant her hymen had been broken. She did not tell the staff she was raped, but did indicate that she had sexual intercourse with a man for the first time and ask if her hymen had been broken.

At her scheduled meeting with Palacios, Roe related what happened, including that she was penetrated multiple times without consent. She did not identify Doe by name.

Doe violated the stay-away letter.  Roe began feeling that her encounters with Doe were not random and that he was "purposefully trying to find [her]" or "find ways to intimidate [her] and make [her] feel unsafe."  Roe was freaked out and reported to Palacios an incident one evening when Doe walked directly up to her and got "really close to her face."  He said something that she could not hear because she had earphones on.

On December 13, 2013, the office of the dean of students emailed Doe that he may have engaged in behavior that violated the stay-away letter and reminded him not to violate its instructions.

In the new semester, Roe's class schedule was such that she saw Doe up to eight times a day, which she found very upsetting.  Also, Roe observed Doe's behavior towards other female students and heard about encounters he had with other women.  Roe told Palacios that she was afraid of Doe and worried he might do something to her friends.  She felt that "it wasn't healthy for him to be on the same campus with her."

Roe filed her formal sexual assault complaint on January 31, 2014.  The report reflected that the two had met previously at a fraternity party where they kissed.  He asked for sex but she declined, telling him she was a virgin.  On the evening of September 28, 2013, Roe saw Doe at the GLO dance party.  They kissed.  He asked if she wanted to have sex.  She said no, but agreed to make out with him in his room.  Once there, Doe penetrated Roe with his penis.  She told him "no and to stop.  They continued making out and he penetrated her again."  After the third time, she screamed but he put his hand over her mouth.  She tried to leave but he pulled her back and downplayed her desire to remain a virgin.  He told her "she owed

7

him something" and asked for anal sex. Believing she could not leave the dormitory without a key, she acquiesced to his request. Later, she put her clothes on and fell asleep in the room. The next morning, Doe penetrated her anus again. Doe then walked Roe back to her dormitory.

IV.     Notice to Doe; the interim suspension; and the investigation

Occidental sent a notice to Doe on February 6, 2014 advising him of Roe's complaint alleging an incident of sexual misconduct on September 28 to 29, 2013, and that Occidental would conduct a formal resolution process which would include an investigation. The notice told Doe where he could find the policy and provided a contact to obtain more information on the investigation and the complaint. Due to the nature of the allegations, Occidental imposed an interim suspension on Doe, effective February 6, 2014, and pending resolution of the complaint.

Doe immediately engaged counsel and a private investigator who, in February 2014, took recorded statements of three of Doe's friends.

Occidental engaged Public Interest Investigations, Inc. (PII) as the external investigator. PII interviewed Roe on February 13, 2014. Beginning on February 14, 2014, PII repeatedly attempted to interview Doe. They exchanged emails discussing Doe's concerns about the investigation. Finally, PII interviewed Doe on March 20, 2014, and provided him access to his interview summary on April 4, 2014. Between February 13 and April 2, 2014, PII interviewed 12 witnesses, plus Doe and Roe, and reviewed medical records, electronic logs, text messages,

8

floor plans, and other evidence.  PII also toured the campus grounds and Doe's dormitory.

A.     *Roe's account of the incident to PII*

Roe told PII that the two met a few times before the incident.  Once at a fraternity party, they danced and engaged in consensual kissing.  She declined his invitation to go to his dorm room, stating that she was a virgin and did not want to have sex with him.  Doe responded, "That's ok.  I respect that."

Roe came to the GLO dance with a group of friends on the night of September 28, 2013.  She ate a marijuana candy and drank two shots of liquor.  Doe had consumed approximately six beers.[1]  The two danced and kissed.  Doe invited Roe back to his room and she again told him that she was a virgin and would not have sex with him; "if that is what you want, you should find someone else."  Doe responded that he just wanted to make out, and "I won't force you to do anything else."  Roe explained that when she first agreed to go to Doe's room, she expected they would engage in oral sex but not sexual intercourse.

Once in Doe's room, the two engaged in mutual sexual conduct, including kissing, fondling, and oral sex.  She then attempted to leave his room because he made comments that she found troubling, including that he was contemplating being "evil for the rest of his life."  When she tried to leave, Doe pulled her back on the bed "very forcefully," placing both of his hands on her

---

[1] The adjudicator eventually found that although both parties admitted that they had consumed alcohol and Roe admitted that she consumed marijuana, neither party asserted that they were incapacitated and so the element of incapacity was not considered by the adjudicator.

shoulders or her waist.  Roe felt "trapped" and unable to leave, while Doe continued to "rant about feeling like an outsider."

Doe apologized for his remarks and they began kissing again.  She closed her eyes while Doe started touching her vagina with his hand.  Then she felt something that was "harder than his hand inside [her]."  Realizing it was his penis inside her vagina, Roe started "freaking out" and felt like she was going to throw up.  She asked Doe what he was doing and told him, "[y]ou aren't going to have sex with me."  Doe pulled his penis out of her vagina and said, "You can't come in here and torture me like that.  It's not fair.  Do you do this to all men?"  Roe told Doe she wanted to leave.  Doe apologized again and suggested that they just "pleasure each other."

According to Roe, the two engaged in more mutual kissing and fondling, but he once again inserted his penis into her vagina without her consent.  Roe asked him to stop and he did.  Roe told him she did not want him to take her virginity.  Doe asked her, "Why should your virginity even matter?"  Roe told Doe she felt really uncomfortable.  Doe promised he would not penetrate her vagina with his penis again.  Roe felt she could not leave because she had already tried twice but was prevented by Doe.  She stayed based on his promise.  Between five and 20 minutes later, Doe again inserted his penis into her vagina.  Roe screamed.  Doe placed his hand over her mouth and said, "Don't scream, my roommates will hear."  She told him to stop and he pulled his penis out of her vagina.

Doe began yelling at her, "You are torturing me" and that she had at least to agree to give him oral sex.  Consenting, Roe did so briefly before Doe stopped her so he could go to the bathroom.  While Doe was in the bathroom, Roe contemplated

leaving but mistakenly thought she needed a key card to exit the building and did not think that Doe would let her out based on his earlier conduct when she had tried to leave. She felt "scared and fearful," "unhappy and confused," and that Doe was "manipulative."

When Doe returned from the bathroom, he told Roe that it was "not fair, and she had to at least agree to have anal sex with him." She told him she did not want to but Doe insisted that "[y]ou have to." Roe agreed because she felt pressured to say yes. She was exhausted and wanted to sleep. She began yelling when Doe penetrated her anus. He stopped and complained that she did not let him "put it in all the way." The two eventually went to sleep. The following morning, Doe again inserted his penis into Roe's anus. She pushed him away. He stopped. Roe told Doe she wanted to leave. Doe walked Roe back to her dorm.

Langseth-DePaolis related to the investigator that Roe claimed to have "flashbacks and [was] thinking about [Doe]." Roe told Langseth-DePaolis that she was "really nervous and she felt like throwing up and [was unable to] breathe." Lorenz told the investigator that Roe appeared "shocked" and did not want to discuss the details but asked for extensions on assignments. Since the incident, Lorenz reported, Roe struggled in class and was "in a fog" "more in shock, like a deer in traffic."

B. *Doe's account of the incident to PII*

Doe denied much of Roe's account in his interview with PII. He reported that Roe did not say she was a virgin and that she did not want to have sex with him, although he already knew about her virginity. Doe stated he had no intention of having sex with Roe; he only planned to "fool[ ] around a little bit." When questioned further, Doe stated he did not remember whether Roe

11

talked about being a virgin or not wanting to have sex. He later stated that at some point, he brought up Roe's virginity and recalled reassuring her that he would not pressure her to have sex. Doe denied having sexual intercourse that night. He claimed that Roe "random[ly]" suggested they try anal sex, without his prompting, and as a result the first anal penetration was consensual. Doe denied Roe attempted, or said she wanted, to leave his room at any point, nor did he try to prevent her from leaving.

Doe's two roommates were home in their triangle dorm suite with their respective doors closed when Roe and Doe arrived. They did not see or hear Roe. One roommate confirmed to the investigator that Doe knew that Roe was a virgin. Doe told him that there was "a disagreement about what they would do [sexually] and how far they were going to go." Doe told the roommate that he and Roe ended up talking most of the night.

V.     Procedural background

PII provided its final investigation report, along with summaries of the witness interviews and other evidence, to Occidental's Title IX hearing coordinator. The hearing coordinator found "there [was] sufficient information upon which a determination of a potential violation of the . . . Policy [could] be made." The hearing coordinator sent Doe and Roe a notice of the charges on April 25, 2014. The notice contained Roe's allegation that Doe had vaginal intercourse with her three times and anal intercourse with her two times, all without her consent. Roe further alleged Doe used coercion to engage in these acts of non-consensual sex and to prevent her from leaving his room. The notice informed Doe that he was being charged with violating the

12

policy's prohibition against sexual assault and non-consensual sexual contact.

On May 2, 2014, the hearing coordinator notified Doe of the May 12, 2014 hearing date. The notice identified the external adjudicator and provided Doe with electronic access to the password-protected website containing all of the investigation's documents and evidence. Doe viewed the information on the website seven times between May 2, 2014 and May 10, 2014.

The hearing took place on May 12, 2014 and lasted five hours. Six witnesses testified, including the PII representative. In her May 14, 2014 written decision, the adjudicator found by a preponderance of the evidence that Doe vaginally and anally penetrated Roe without effective consent, thereby violating Occidental's policy. Occidental permanently separated Doe from the college immediately.

Doe appealed the decision to Occidental's associate dean of students. After his appeal was denied, Doe filed his petition for writ of mandate seeking to have Occidental set aside its decision. His petition alleged that Occidental abused its discretion by failing to proceed in the manner required by law because it denied him a fair hearing and its findings were unsupported by the evidence. In a comprehensive statement of decision, the trial court denied the petition. Doe filed his timely appeal from the ensuing judgment.

## DISCUSSION

I.    Standard of review

The remedy of administrative mandamus under Code of Civil Procedure section 1094.5 " ' "applies to private organizations that provide for a formal evidentiary hearing." ' [Citation.] In

13

cases that do not ' "involv[e] a fundamental vested right," ' we review the [adjudicator's] decision rather than the trial court's decision, ' "applying the same standard of review applicable in the trial court." ' [Citation.] This standard has been applied to college disciplinary decisions involving sexual misconduct." (*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1065 (*CMC*).)

"When reviewing the denial of a petition for writ of administrative mandate, we determine 'whether [Occidental] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' [Citations.] In this context, 'fair trial' refers to a fair administrative hearing. [Citation.] We review the fairness of the proceedings de novo, and the substantive decision for substantial evidence." (*CMC*, *supra*, 25 Cal.App.5th at p. 1065.)

## II.    Fair process

"Generally, a fair procedure requires 'notice reasonably calculated to apprise interested parties of the pendency of the action . . . and an opportunity to present their objections.' " (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 240 (*USC*).)

The cases do not plainly define the components or standards of a fair hearing in student disciplinary proceedings involving allegations of sexual misconduct. (*USC*, *supra*, 246 Cal.App.4th at p. 245; *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1078 (*Regents*).) A fair hearing "need not include all the safeguards and formalities of a criminal trial." (*Regents*, at p. 1078.) " '[T]he pure adversary model is not entitled to constitutionally enshrined exclusivity as the means for resolving disputes in "[t]he incredible variety of administrative

14

mechanisms [utilized] in this country." ' " (*USC*, at p. 244.) "[C]ourts have recognized competing concerns.  On the one hand, an accused student has an interest ' "to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. . . .  The risk of error is not . . . trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process." ' " (*CMC*, *supra*, 25 Cal.App.5th at p. 1066.)  "On the other hand, ' "[a] formalized hearing process would divert both resources and attention from a university's main calling, that is education." ' . . . [Citation.]  Disciplinary proceedings involving sexual misconduct must also account for the well-being of the alleged victim, who often 'live[s], work[s], and stud[ies] on a shared college campus' with the alleged perpetrator." (*Ibid.*; *USC*, at p. 245.)

While no particular form of student disciplinary hearing is required in California, " '[a]t the very minimum, . . . students facing suspension . . . must be given some kind of notice and afforded some kind of hearing.' [Citation.]  The hearing need not be formal, but 'in being given an opportunity to explain his version of the facts at this discussion, the student [must] first be told what he is accused of doing and what the basis of the accusation is.' " (*USC*, *supra*, 246 Cal.App.4th at p. 240.) Universities are bound by their own policies and procedures. (*Regents*, *supra*, 5 Cal.App.5th at p. 1078.)  And, " 'to comport with due process,' the university's procedures must ' "be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' [citation] . . . to insure that they are given a meaningful opportunity to present their case." ' " (*Ibid.*)

A. *No violation of the policy's notice requirements*

Doe contends that Occidental violated its policy by failing to provide him timely notice. He argues he "did not receive notice of Roe's complaint until after [Occidental] completed its investigation, nearly three months after Roe filed her complaint." He also argues he did not receive a "summary" of the allegations against him before he was interviewed. To be clear, Doe does not challenge the legal sufficiency of the policy, and he does not contend that he never received notice of the specific allegations against him, or that he was precluded from presenting his case at the hearing. Rather, he argues that he did not receive notice before he was interviewed by PII in March 2014.

Doe is wrong. Occidental gave Doe notice on February 6, 2014—*a week after Roe filed her complaint*. In compliance with appendix A, section (V)(D)(1) of the policy, that notice advised Doe that Roe was "*alleging an incident of sexual misconduct*," a term used in the policy, "on or about September 28-29, 2013." (Italics added.) The notice contained links to the policy and the student code of conduct, and provided contact information if Doe had questions about the complaint. Thus, Doe received notice shortly after Roe filed her complaint, prior to his interview, and before PII completed its report. Even earlier than that, Occidental gave Doe notice that Roe had made a report on October 28, 2013, when it sent him the stay-away letter, and on December 13, 2013, when it emailed Doe a reminder of the stay-away requirement. Doe clearly knew about the allegations because he denied them when he yelled at Palacios in October 2013. Furthermore, the requirement is that notice simply apprise Doe " 'of the *pendency* of the action.' " (*USC, supra*, 246 Cal.App.4th at p. 240, italics added.) Logically, Occidental was

16

not obligated to provide Doe with formal notice *before* Roe even filed the complaint against him that began the action.

Doe argues that Occidental violated the policy by failing to "articulate the specific policy sections allegedly violated until *after* PII's investigation ended." Review of the record reveals that Occidental proceeded exactly as required by appendix A, section (IV)(A), by sending Doe written notification "[a]t the conclusion of [PII's] investigation" that contained a "summary of the conduct at issue and the specific provision of the policy violation(s) that are alleged to have [occurred]," and listed the alleged policy violations as "Sexual Assault" and "Non-Consensual Sexual Contact," along with their definitions. *USC*, *supra*, 246 Cal.App.4th 221, cited by Doe is inapposite. In *USC*, the administrative appeal absolved the student of the charges alleged against him, but disciplined him for conduct of which he had never received notice. (*Id.* at pp. 234–236.) In contrast, Occidental did not engage in any "bait and switch." Occidental informed Doe of the sexual assault and non-consensual sexual contact charges against him. Doe had a five hour hearing during which he addressed the same allegations that were contained in the notice and in the investigative report. The adjudicator found that he had committed sexual misconduct as stated in the notice and nothing different.

Doe next contends that Occidental violated its own policy when it suspended him from campus in early February 2014, before the investigation had begun, and "without [providing him] any notice of the charges." Again, Doe misstates the facts. Occidental in fact did comply with the policy. Pursuant to section VIII, subdivisions (A) and (B), Occidental sent Doe a campus stay-away letter in October 2013. As Doe appeared to

17

violate that letter, Occidental sent him a reminder email in December 2013.  Then, following section VIII, subdivision (C), which gives it authority in the face of an immediate threat of harm to the safety or well-being of an individual, Occidental placed Doe on interim suspension pending resolution of the report.  The record indicates not only that Doe violated the stay-away letter, but also that Roe was concerned about his conduct with other women and was afraid he would threaten her friends.  The notice also informed Doe that Roe had filed a complaint with the Title IX office alleging an incident of sexual misconduct on September 28 through 29, 2013; that Occidental was undertaking an investigation; and that it had the discretion to place students on interim suspension immediately *and without prior notice*.

### B.    *No procedural unfairness*

#### 1.    No prejudice by exceeding the 60-day guideline for hearings

Doe contends that Occidental violated the policy's provision that "required it to resolve complaints within 60 days."  What the policy actually states in section IX, subdivision (G), is that "[t]he College seeks to resolve all reports within 60 days of the initial report.  *All time frames expressed in this policy are meant to be guidelines rather than rigid requirements.*  Extenuating circumstances may arise that require the extension of time frames, including extension beyond 60 days."  (Italics added.)  The policy provides an incomplete list of extenuating circumstances.  Although the record does not reveal an explanation for why the 60-day guideline was exceeded here, Doe fails to indicate how he was prejudiced by any delay.  He argues that as the result of the delay, the hearing was held the day after summer recess began, which prevented witnesses from attending

18

the hearing.  However, six witnesses, including Doe's two roommates and his friend, testified either in person or by telephone.  Otherwise, Doe has not identified what witness the scheduling prevented him from calling.

> ### 2. Doe had access to all of the evidence against him

Doe contends Occidental violated its policy by failing to provide him any evidence during the investigation, only allowing him to view the investigative report and exhibits 10 days before the hearing.  The policy does not provide for distribution of evidence *during* the investigation.  Apart from the fact that Doe's receipt 10 days before the hearing exceeded the minimum of *five days* that the policy does provide for (§ V, subd. (D)(5)), Doe never claimed at the administrative level that the 10 days was insufficient, and he never requested a continuance.  More important, Doe does not claim he was unprepared for the hearing.  Nor could he, because he retained counsel who conducted its own investigation months before the hearing, giving him ample time to prepare.

Next, Doe contends that the investigative report contained only the initials of the witnesses rather than their full names, and cites to a redacted version of the report submitted to the trial court in connection with his petition for writ of mandate.  There, he alleged that "PII interviewed several additional student witnesses whose names were redacted from the investigation report and undisclosed to [Doe]."

Our review of the trial court and administrative record reveals otherwise.  According to the declaration of Ruth Jones, Title IX coordinator, under penalty of perjury and attached to Occidental's sur reply to the writ petition, Occidental gave Doe

19

password-protected, electronic access to all of the hearing documents, including the investigative report and supporting witness interview summaries, with the full names of all witnesses. Doe viewed the unredacted version in the administrative record seven times between May 2, and May 10, 2014. Jones also declared, "At no point during the administrative process did . . . Doe, his advisor, or his retained counsel advise my office that . . . Doe was unaware of the identities of the witnesses." Doe did not include, as one of his numerous objections to the process at the administrative hearing, the objection that witnesses were only identified by initials. Nor did Doe provide the trial court with a sworn counter-declaration to that of Jones. Therefore, even if the investigative report he received only contained witnesses' initials, Doe failed to demonstrate prejudice. Doe knew the names of all of the witnesses.

### 3. The contention of adjudicator bias is forfeited

Doe dedicates much of his appeal to his contention that the external adjudicator was "blatantly biased" in favor of Roe. (Capitalization and boldface omitted.)

"A party seeking to show bias or prejudice on the part of an administrative decision maker is required to prove the same 'with concrete facts: " '[b]ias and prejudice are never implied and must be established by clear averments.' " ' " (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 483.) But, "[w]hen a litigant suspects bias on the part of a member of an administrative hearing body, the issue must be raised in the first instance at the hearing." (*Attard v. Board of Supervisors of Contra Costa County* (2017) 14 Cal.App.5th 1066, 1083.)

Here, Doe did not raise the issue of bias at the administrative level or in the trial court. Doe's first mention of adjudicator bias is in his brief on appeal, in an apparent effort to have us re-assess the credibility of the witnesses. We will not consider the issue of bias raised for the first time on appeal; Doe has forfeited the contention. (See *Horn v. Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610.)

III.    No abuse of discretion in finding Doe violated the policy by having nonconsensual sexual contact with Roe

Initially, Doe contends that we should independently review the administrative decision because, he argues, it affects a vested fundamental right. But, California cases reviewing colleges' disciplinary decisions concerning student sexual misconduct have repeatedly applied the substantial evidence standard because the decisions there "do not ' "involv[e] a fundamental vested right." ' " (*CMC*, *supra*, 25 Cal.App.5th at p. 1065; *USC*, *supra*, 246 Cal.App.4th at pp. 239 & 238; *Regents*, *supra*, 5 Cal.App.5th at p. 1073.) This makes sense where the United States Supreme Court has recognized that among the " ' " 'four essential freedoms' of a university [is the freedom] to determine for itself . . . who may be admitted to study." ' " (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1726.) " ' "Although a university must treat students fairly" ' " (*CMC*, at p. 1066), its "main calling" is education and so " ' "it is not required to convert its classrooms into courtrooms." ' " (*Ibid.*) These California authorities, to which we are clearly bound, distinguishes this case from the out-of-state cases cited by Doe. (*Furey v. Temple Univ.* (E.D.Pa. 2012) 884 F.Supp.2d 223 [public

21

university]; *Doe v. Rector & Visitors of George Mason University* (E.D.Va. 2016) 149 F.Supp.3d 602 [public university].)**2**

Our substantial evidence standard is extremely deferential. (*Regents, supra,* 5 Cal.App.5th at p. 1073.) " '[W]e do not "weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it." ' [Citation.] ' "[The administrative agency's] findings come before us 'with a strong presumption as to their correctness and regularity.' [Citation.] We do not substitute our own judgment if the [agency's] decision ' " 'is one which could have been made by reasonable people. . . .' [Citation.]" ' " ' [Citation.] 'Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence.' [Citations.] [¶] We are required to accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the verdict. [Citation.] Credibility is an issue of fact for the finder of fact to resolve [citation], and the testimony of a single witness, even that of a

---

**2** California courts are not bound by out-of-state cases. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447, fn. 2)

Doe also cites *Goss* v. Lopez (1975) 419 U.S. 565 for this proposition. The Supreme Court in *Goss* recognized that where state law has created a student's entitlement to a *public education*, that entitlement constitutes a property interest that is constitutionally protected. (*Id.* at pp. 573–574, 576.) But *Goss* involved public secondary-school pupils, not private-college students. (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1062.)

party, is sufficient to provide substantial evidence to support a finding of fact." (*Id*. at pp. 1073–1074.)[3]

Viewing the entire record here, it supports the adjudicator's conclusion that Doe committed sexual assault and non-consensual sexual contact on September 28 and 29, 2013. The policy defines sexual assault as "[h]aving or attempting . . . sexual intercourse with another individual: [¶] By force or threat of force; [or] [¶] Without effective consent." Non-consensual sexual contact is defined in the policy as "[h]aving sexual contact with another individual: [¶] By force or threat of force; [or] [¶] without effective consent."

Roe consistently stated in her interviews and to Langseth-DePaolis, Lorenz, Palacios, and her three friends that she told Doe she was a virgin and did not want to have sex with him. Nonetheless, Doe penetrated Roe's vagina numerous times with his penis. Following the incident, Roe had a pregnancy test, corroborating the fact that vaginal penetration occurred as she alleged. Furthermore, Roe conveyed that she submitted to anal sex because Doe attempted to restrict her from leaving his room and he was verbally and physically aggressive toward her. Thus, the anal sex occurred by force or threat of force, and without effective consent. The second episode of non-consensual anal sex occurred the next morning when Roe awoke to find Doe's penis in her anus. Roe's account is sufficient to provide substantial

---

[3] We note, even under the independent judgment standard, "a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.)

evidence to support a factual finding, and it was substantiated by the other witnesses. (*Regents*, *supra*, 5 Cal.App.5th at p. 1074.)

To challenge the adjudicator's findings, Doe argues "the facts simply do not support a finding . . . [he] engaged in nonconsensual sexual activity" because he consistently denied Roe's account, and because Roe's testimony "downright lack[ed] . . . credibility." He lists evidence he claims the adjudicator "ignored," and other facts that support his version of events to argue "it is plausible that Roe was mistaken about any penetration occurring." Doe's argument—an attempt to reweigh the evidence—is unavailing.

Recognizing that the parties' testimony about whether Doe penetrated Roe's vagina or anus conflicted, and that the critical issue was to determine whose version was more reliable, the adjudicator listed the reasons she found Roe's version to be more persuasive: (1) Doe's statements to others were consistent with statements Roe attributed to him; (2) Doe made inconsistent statements; (3) Roe's reporting was consistent; (4) information provided by Roe was corroborated by Doe; (5) Roe's conduct was consistent with vaginal penetration; (6) Doe's testimony that the absence of bruising requires a finding that no sexual assault occurred; and (7) the inability of Doe's witnesses to competently testify to the events that occurred in Doe's room. Thus, the result here was predicated on credibility findings. Credibility is an issue of fact for the adjudicator to resolve. The adjudicator gave reasons for her conclusion that Roe's account was more reliable. We may not reassess that finding. (*Regents*, *supra*, 5 Cal.App.5th at pp. 1073–1074.) Doe has demonstrated no error.

24

**DISPOSITION**

The judgment is affirmed.  Occidental College is awarded its costs on appeal.


DHANIDINA, J.

We concur:


EDMON, P. J.


MURILLO, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| JOHN DOE, | B282292 |
| | (Los Angeles County |
| Plaintiff and Appellant, | Super. Ct. No. BS150532) |
| v. | CERTIFICATION AND |
| | ORDER FOR PUBLICATION |
| OCCIDENTAL COLLEGE, | |
| Defendant and Respondent. | |


The opinion in the above-entitled matter filed July 2, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.



DHANIDINA, J.          EDMON, P. J.