Filed 8/27/19 Certified for Publication 9/23/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOHN DOE, | B284707 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS147275) |
| v. | |
| OCCIDENTAL COLLEGE, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Affirmed.

Werksman Jackson Hathaway & Quinn, Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

Cynthia P. Garrett for Foundation for Individual Rights in Education as Amicus Curiae on behalf of Plaintiff and Appellant.

Epstein Becker & Green, Jonathan M. Brenner and Susan Graham for Defendant and Respondent.

# INTRODUCTION

Occidental College expelled John Doe for violating its sexual misconduct policy after he sexually assaulted Jane Doe. An external adjudicator found Jane was incapacitated within the meaning of the policy because she was intoxicated and unable to make "an informed and rational decision to engage in sexual activity." The adjudicator found John was also intoxicated; in fact, so intoxicated he did not know Jane was incapacitated. Under Occidental's policy, however, John's intoxication did not diminish his responsibility to obtain Jane's consent, and John violated the policy because he should have known Jane was incapacitated. The adjudicator concluded a sober person in John's position should have known Jane was too drunk to consent.[1]

After unsuccessfully appealing within the college, John filed a petition for writ of administrative mandate in the trial court. The trial court denied the petition and entered judgment in favor of Occidental. John argues on appeal that he did not have a fair disciplinary hearing and that the evidence did not support the adjudicator's findings. We affirm.

---

[1] We refer to Occidental's sexual misconduct policy in effect when Jane accused John of violating it. As of January 22, 2019 Occidental revised its policy and issued a new interim sexual misconduct policy. (See https://www.oxy.edu/sexual-respect-title-ix> [as of Aug. 9, 2019], archived at < https://perma.cc/JDZ7-ETZP>.)

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *Occidental's Sexual Misconduct Policy*

Two weeks before their sexual encounter, John and Jane both attended freshman orientation sessions on sexual misconduct and Occidental's sexual misconduct policy. Occidental's policy prohibits sexual assault, which it defines as "[h]aving or attempting to have sexual intercourse with another individual . . . [b]y force or threat of force," "[w]ithout effective consent," or "[w]here [the other] individual is incapacitated." The policy also prohibits non-consensual sexual contact, which it defines as "[h]aving sexual contact with another individual . . . [b]y force or threat of force, "[w]ithout effective consent," or "[w]here that individual is incapacitated."

The policy defines "incapacitation" as "a state where an individual cannot make an informed and rational decision to engage in sexual activity because s/he lacks conscious knowledge of the nature of the act (e.g., to understand the who, what, when, where, why or how of the sexual interaction) and/or is physically helpless. An individual is incapacitated, and therefore unable to give consent, if s/he is asleep, unconscious, or otherwise unaware that sexual activity is occurring."

The policy discusses the relationship between alcohol use and incapacitation. The language we italicize was central to the adjudicator's decision here: "Incapacitation may result from the use of alcohol and/or drugs. *Consumption of alcohol or other drugs alone is insufficient to establish incapacitation.* The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impacts an individual's: [¶]

3

decision-making ability; [¶] awareness of consequences; [¶] ability to make informed judgments; or [¶] capacity to appreciate the nature and the quality of the act. [¶] Evaluating incapacitation also requires *an assessment of whether a Respondent knew or should have known, that the Complainant was incapacitated.* [¶] . . . In general, sexual contact while under the influence of alcohol or other drugs poses a risk to all parties. Alcohol and drugs impair a person's decision-making capacity, awareness of the consequences, and ability to make informed judgments. It is especially important, therefore, that anyone engaging in sexual activity be aware of the other person's level of intoxication. If there is any doubt as to the level or extent of the other individual's intoxication or impairment, the prudent course of action is to forgo or cease any sexual contact or activity. [¶] *Being intoxicated or impaired by drugs or alcohol . . . does not diminish one's responsibility to obtain consent.*"

B.    *Saturday Night and Sunday Morning, September 7-8, 2013*

Jane and John knew each other, but not well. They lived on different floors of the same dormitory and had one class together. John was 18, and Jane was one month shy of 18. Multiple witnesses told Occidental's investigators or testified at the disciplinary hearing that, during the hours before John and Jane had sexual intercourse, Jane drank large quantities of vodka and became extremely intoxicated. The investigation report, witness interview summaries, and testimony at the hearing described the following events.

4

1.    *9:15 p.m.-11:30 p.m.: Jane Gets Drunk*

Jane began drinking alcohol in her dormmate Liam's room at approximately 9:15 Saturday evening. Jane drank orange juice mixed with vodka and several shots of straight vodka. Jane's friend Angela said Jane was "drinking heavily." Other witnesses described Jane as "a little bit drunk, but still in control," and "buzzed." Jane described herself as "tipsy."

At 9:45 p.m. Jane and others decided to go to a fraternity party. Jane went to her room to change clothes. Jane's roommate Genevieve recalled Jane was drinking orange juice mixed with alcohol, but was "pretty lucid" and "talking and walking normally."

After leaving the dormitory, Jane became "more and more drunk." She could not walk straight. She stumbled and scraped her knee but could not feel it. She testified, "[T]hat's how drunk I was." Angela testified, "[I]t seemed like [Jane] became more . . . out of touch with . . . what was going on with her . . . ." Other witnesses observed Jane "could not walk a straight line and . . . was 'getting loud.'"

When Genevieve encountered Jane at 11:30 p.m., Jane was "visibly more intoxicated" than she had been earlier in the evening. She was stumbling and spoke in a "high-pitched" voice. Genevieve believed Jane's "decision-making capacity" was "hazy." She testified: "I wouldn't trust Jane to make sound . . . decisions that she would make while sober when I saw her then," and even "[m]ore so later [that evening]."

Jane decided to return to the dormitory. She told her friends, "I can't walk anymore. I'm just going to go back to [the dormitory]." According to Chloe, who met Jane at orientation,

Jane had obviously been drinking and "was not able to walk very well." Angela told Jamison, another friend of Jane, they "needed 'to take care of Jane.'" Angela later told investigators: "During freshmen orientation . . . [we] were told [we] were supposed to watch out for . . . friends when they were partying. I know it sounds corny . . . but I was trying to be a good person and be there for Jane as much as I could."

### 2.    *7:00 p.m.-11:00 p.m.: John Gets Drunk*

Liam saw "a lot of alcohol," including vodka, rum, and beer in John's room after 7:00 p.m. John was "'exuberant,' as if he had been drinking 'a good amount.'" He had a bottle of alcohol in his hand and was dancing around the room. Liam said John was "not sloppy but a shot or two past tipsy." Another resident of the dormitory, Aidan, also stopped by John's room at 7:00 p.m. John's friends told Aidan that John was "really drunk." Aidan described John as "[k]ind of clumsy" and having "slow speech."

At 11:00 p.m. John's roommate, Gavin, was getting ready to leave when John walked into the room. John was stumbling, slurring his words, and speaking in a loud voice. After observing John for an hour, Gavin "decided not to go out, so that he could 'keep an eye' on John." Aidan, who was also in John's room at the time, described John's "level of intoxication" as "a 'shit show.'" John "was slurring his words [and] stumbl[ing] . . . ." Aidan estimated "that on a 0 to 10 scale, with 10 being inebriated to the point of not being able to function, John was 'maybe a 7.'"

### 3.    *11:30 p.m.: Jane Goes to John's Room*

Jane returned to her room on the third floor of the dormitory at 11:30 p.m., but did not stay there. She was "bored,"

"wired with energy," and "drunk." She went to the second floor "because there were usually people there." John's roommate Gavin saw Jane leaning against the hallway wall and heard her slurring her words. Jane followed Gavin to John's room, where she embraced John and started dancing with him. It seemed "kind of intense," so Gavin left.

Angela and Jamison lost track of Jane and were worried. Angela called Jane, who said she was in John's room. Angela and Jamison found Jane and John dancing and kissing and drinking vodka from a bottle. Angela estimated Jane drank three or four more shots. Jane was stumbling and leaning on things to support herself. Later, Jane and John embraced on John's bed and were "getting really physical." Angela was concerned that Jane "was not fully aware of what she was doing" and that Jane "did not seem to know where she was or what was going to happen next." Angela "wasn't sure how [Jane] would feel about" kissing John. Angela told Jane she should stop drinking and tried repeatedly to take away the vodka bottle. Angela believed John heard her: "Yeah. I'm sure he could have . . . heard [me tell Jane to stop drinking]." John appeared "very intoxicated" and "really drunk." John told Jamison he had been drinking since 1:00 p.m.

At midnight, Angela and Jamison took Jane to her room. By then, Jane was "super drunk" and "incoherent." Angela put Jane in bed, closed the door, and left. Jamison waited outside Jane's room briefly before he also left.

4. *12:20 a.m. -12:45 a.m.: Jane and John Exchange Text Messages*

At 12:20 a.m. Jane sent a text message to her best friend from home saying, "I'm wasted." Between 12:31 and 12:45 a.m., Jane and John exchanged text messages, including these:

John: "The second that you're away from [Angela and Jamison] come back."

Jane: "Okay."

John: "Get the fuck back here. Get the fuck back here."

Jane: "They're still with me . . . ."

John: "Make them leave. Tell them yo[u] want to sleep. . . . Just get back here."

Jane: "Okay do you have a condom."

John: "Yes."

Jane: "Good give me two minutes."

John: "Come here."

Jane: "Coming."

John: "Good girl. Knock when you're here."

Jane: "[Jamison is] out ride [*sic*] my door."

John: "What.

Jane: "[Jamison] is outside my door."

John: "Wtf."

Jane: "Right."

John: "Get him to leave."

Jane: "Working on [i]t."

. . . .

John: "Leave. Say you're going to the bathroom."

Jane: "Okay."

Before leaving her room, Jane texted her friend from home again at 12:40 a.m. and said, "The worlds moving. I'mgoingtohave sex now."

5.      *12:45 a.m.-2:00 a.m.: Jane Goes to John's Room Again*

Gavin saw Jane on the second floor stumbling in the hallway and vomiting in a trash can. He helped her into a bathroom where she vomited again. When Jane said she felt better, Gavin left. Jane went to John's room and told him she had just vomited. (John testified he had no memory of Jane vomiting.)

At 2:00 a.m. Gavin told Aidan that Jane had been drinking, had thrown up, and was alone with John in John's room. Aidan was concerned. He testified: "I was worried . . . if she was intoxicated, that she shouldn't be . . . alone in a room with someone else [because] she's not in the right mind to, like, make decisions like that[.]" Aidan also knew John had been "very drunk earlier." Aidan expressed his concern to Gavin, who gave him a key to the room. Aidan found John sitting on the bed naked with Jane under the covers. John said, "Yo, get the fuck out." Minutes later, John came out of the room and walked "in a normal gait" toward the bathroom. Aidan knocked on the door and asked three times if Jane was okay. Jane said, "Yeah, I'm fine."

Gavin also walked in on John and Jane. It was "obvious" to him that they were "having sex." Gavin believed Jane was conscious because he saw her legs moving. He quickly closed the door and left. He later told investigators he "had attended sexual assault prevention training during orientation, and had been told

what to do if he witnessed a sexual assault. 'This didn't look like one to me[.]'" After Gavin entered the room, John told Jane he thought she should leave, and she did.

6.      *2:00 a.m.: Jane Returns to Her Room but Leaves Again*

Angela found Jane in the hallway after 2:00 a.m. "a lot less steady on her feet than she had been earlier" and slurring her words. Genevieve was there when Angela "ushered" Jane into their room. According to Genevieve, Jane was "very incapacitated," "very obviously drunk," even "past drunk." Jane's words were "excessive[ly] slurr[ed]" and she was incoherent. Jane tried to undress but could not undo her buttons. When Genevieve gave Jane water, "it dribbled out of her mouth." Genevieve "check[ed] [Jane] for the signs of alcohol poisoning." Genevieve left briefly to take a shower, and Jane disappeared.

Genevieve found Jane in the lobby of the dormitory next door. Jane was "wearing her pajamas, 'sitting on a couch on some guy's lap.'" Jamison, who was also present, said Jane was "extremely drunk," even more so than when they were together in John's room. Jamison told the investigators, "I didn't know it was possible to be more drunk than she was [earlier]." Jane could not walk without reaching out to balance herself. When Genevieve tried to help Jane up, Jane "buckled under her own weight." Genevieve needed help to get Jane back to their room. She testified, "I was pretty sure that if we weren't supporting her and keeping her upright, she would not be able to stay upright."

Maddie, whose room was next door to Jane's room, saw Genevieve and Jane in the hallway. Jane was "pretty

10

intoxicated" and was "slurring her words and stumbling." Maddie helped Genevieve get Jane into bed.

### 7. *Later Sunday Morning: Jane Learns She Had Sex with John*

Angela woke at 10:00 a.m. to a text message. Jane told Angela "I think I had sex with John last night." Jane had seen her text conversation with John but did not remember sending or receiving the messages. Jane subsequently asked Gavin what had happened. Gavin told her he had seen her having sex with John. Jane told Aidan "she did not remember much of anything," was "not sure what exactly had happened," and was "trying to piece together what had happened." Aidan told Jane, "Well, we think that . . . you and John might have had sex." And Jane said, "Yeah. I was worried that that might have been what happened." Genevieve testified Jane told her "she couldn't believe that it had happened. She didn't remember it. She didn't know if there was protection used or not."

### C. *Occidental Investigates and Conducts a Hearing*

### 1. *The Investigation*

Jane submitted a complaint against John for sexual misconduct. When Occidental receives a sexual misconduct complaint, its "Title IX team"[2] conducts an initial assessment "to

---

[2] Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) is a federal civil rights law that prohibits discrimination based on gender in education programs or activities that receive federal funding. (See 34 C.F.R. § 106.1 et

provide an integrated and coordinated response." Following the assessment, the college decides whether to resolve the matter informally or refer it for investigation. When the college decides to investigate, it designates one or more trained employees or external investigators to conduct a "thorough, impartial and fair" investigation that is "appropriate in light of the circumstances of the case" and "respectful of individual privacy concerns." The investigators "are not charged with reaching a determination as to responsibility." During the investigation, the complainant and respondent have an "equal opportunity to be heard, to submit evidence, and to identify witnesses who may have relevant information." When the investigation is complete, the investigators prepare and submit a written report. The college notifies the parties the investigation is complete and provides them with information about the next step.

Occidental appointed independent investigators to investigate Jane's complaint. The investigators interviewed Jane and nine other witnesses. Jane told the investigators "there [was] a 'big hole' in her memory of the evening." She remembered drinking vodka from a bottle and dancing with John. She said the vodka did not burn her throat "because she was already so intoxicated." She also remembered feeling hot and taking off her shirt. She put her shirt back on after Angela "flip[ped] out." According to Jane, John "pushed her onto the bed, and they 'ma[d]e out for a while.'" John told Jane "to get rid of [Angela] and [Jamison]." He told her to let them take her up to her room and then come back to his room. John asked for Jane's

_____

seq.) Occidental's Title IX coordinator "oversees the College's overall compliance with Title IX."

12

cell phone number so he could text her to come back to his room and he could "fuck" her. (John's subsequent testimony at the disciplinary hearing was consistent to the extent he remembered talking to Jane about "having her leave with her friends so she could come back down so [they] could have sex.")

Jane said she remembered that, after returning to John's room, she asked him if he had a condom. She remembered "performing oral sex on him," but did not remember "having sexual intercourse." Jane also remembered that John briefly left the room and that she heard a knock at the door and voices asking if she was okay. She remembered John telling her his roommate had come into the room.

On his attorney's advice, John declined to allow the investigators to interview him. The investigators issued a written report with a summary of each witness interview. Consistent with Occidental's policy, the investigators did not "reach[ ] a determination as to responsibility."

### 2. *The Threshold Determination*

After Occidental receives the investigation report, it designates a hearing coordinator who, in consultation with the Title IX team, reviews the report and makes "a threshold determination as to whether there is sufficient information upon which an adjudicator could find a violation of this policy. This threshold determination does not involve making a determination of responsibility, nor does it involve a credibility assessment. If the threshold has been established, the Hearing Coordinator will issue a Notification Letter to the [parties] and refer the report for Pre-Hearing Procedures." The notification letter "provides each party with a brief summary of the conduct at issue and the

specific provision of the [alleged] policy violation(s) . . . ."  The parties may consult attorneys, but the attorneys may not participate in the proceedings.  The parties, however, may have an advisor assist them, and they have the right to review investigative documents and call witnesses.

Occidental appointed a hearing coordinator who made a threshold determination there was sufficient evidence to support a finding John violated the college's sexual misconduct policy.  The hearing coordinator notified Jane and John in writing that "[g]iven the nature and severity of the allegations" there would be a formal hearing.

### 3.    *The Disciplinary Hearing*

Following a threshold determination, Occidental holds a disciplinary hearing before a three-member panel or, at the hearing coordinator's discretion, an external adjudicator.  The hearing is "not intended to be adversarial" and is "not comparable to a criminal trial."  The complainant and respondent are not permitted to question each other directly.  Instead, "the parties may submit questions to the hearing panel [or adjudicator] in writing [both prior to and during the hearing], which may be posed at the discretion of the hearing panel [or adjudicator]."  The parties "may . . . request alternative testimony options that would not require physical proximity to the other party."  The hearing panel or adjudicator determines the respondent's responsibility by a preponderance of the evidence and documents its findings in writing.  If the hearing panel or adjudicator finds the respondent violated the sexual misconduct policy, it recommends an appropriate sanction to the hearing coordinator. "The Hearing Coordinator, in consultation with the Title IX

Coordinator, will review the recommendations and impose an appropriate sanction." When the panel or adjudicator concludes the respondent committed a sexual assault, the student "may receive a sanction ranging from suspension to expulsion." Either party may appeal the decision.

Jane, John, the lead investigator, and five freshman students—Gavin, Angela, Aidan, Genevieve, and Chloe—testified during a one-day hearing before the external adjudicator. Jane testified her memory of the incident was "foggy." She remembered some details days and weeks later, after she had spoken with others. She did not remember having intercourse with John, but a few days after their encounter she remembered she had oral sex with him. She did not remember sending the text messages.

John testified there was no alcohol in his room, he did not see Jane drink any alcohol, and he did not hear Angela express concern about Jane's drinking. He also testified, somewhat inconsistently: "I knew [Jane] was drunk. I did not know—I didn't really know she was drunk. I knew she'd been drinking. I didn't know to what level of impairment she was at. But we were . . . conversing normally and having relatively normal interactions for an hour or so, in that window before she left [my room] and came back. In no way did I think or was she incapacitated during that time."

Based on the investigative report, the summaries of the witness interviews, and the testimony of the witnesses at the hearing, the adjudicator found by a preponderance of the evidence John violated Occidental's sexual misconduct policy by sexually assaulting Jane and having non-consensual sexual contact with her. The adjudicator found that Jane's text

15

messages, "coupled with her actions in returning to [John's] room after that exchange of text messages[,] are conduct and statements that would indicate that she consented to sexual intercourse with [John]," but that Jane was incapacitated when she engaged in the conduct. The adjudicator also found that John, who "was more intoxicated than he had ever been," "did not have actual knowledge of [Jane's] incapacitation," but that a sober person in John's position should have known Jane was incapacitated and could not consent.[3] The adjudicator issued a written decision, and Occidental expelled John.

D.     *John Files an Administrative Appeal and a Petition for Writ of Mandate*

As authorized by Occidental's sexual misconduct policy, John appealed in writing to the hearing coordinator. John had the "burden of proof . . . as the original determination and sanction are presumed to have been decided reasonably and appropriately." Counsel for Jane submitted a written response to John's appeal. The hearing coordinator asked the assistant director for housing services to act as the appeals officer and review the appeal. The assistant director conducted a "deferential" review for "clear error" and found "no basis for overturning the external adjudicator's decision."

John filed a petition for administrative mandate under Code of Civil Procedure section 1094.5 in the trial court.[4] John

---

[3]     John does not challenge the sober person standard in Occidental's policy.

[4]     "If a private college has a procedure for conducting sexual misconduct disciplinary proceedings, an accused student may

16

argued the hearing was unfair because the proceedings were "typified by [a] lack of impartiality," the adjudicator "purposefully" failed to ask questions that John had proposed and that were "critical" to his defense, and the hearing coordinator denied John "reasonable access to evidence." John also asserted the evidence did not support the adjudicator's findings. The trial court denied the petition and entered a judgment in favor of Occidental. John timely appealed.

## DISCUSSION

### A. *Standard of Review*

"A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right; thus, we review the administrative decision applying the same standard of review applicable in the trial court." (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1231 (*USC III*); accord, *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1013 (*Occidental*); *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1060 (*Allee*).) "The question presented by a petition for writ of administrative mandate is whether the agency or tribunal that issued the decision being challenged 'proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' ([Code Civ. Proc.,] § 1094.5, subd. (b).) 'Abuse of discretion is established if the respondent has not proceeded in the manner

challenge the outcome of the proceedings in a petition for a writ of administrative mandate." (*Doe v. Westmount College* (2019) 34 Cal.App.5th 622, 634.)

17

required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.'" (*Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 34 (*USC II*); accord, *Occidental*, at p. 1014; *USC III*, at p. 1230.) However, "[w]e review the fairness of the administrative proceeding de novo. 'A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law.' [Citation.]" (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*USC I*); see *Occidental*, at p. 1014 ["we review the fairness of the proceedings de novo, and the substantive decision for substantial evidence"].)

### B. *The Disciplinary Hearing Was Fair*

#### 1. *The Hearing Requirements in Private College Sexual Misconduct Proceedings*

In several recent cases, California courts have found fault with the procedures in private university sexual misconduct disciplinary proceedings. These deficiencies include failing to interview or hear testimony from and assess the credibility of critical witnesses (*Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 636-637 (*Westmont*); *USC III*, *supra*, 29 Cal.App.5th at pp. 1215-1216, 1232-1237), failing to give the respondent notice of the factual basis for the charges or access to evidence (*Westmont*, at pp. 637-638; *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 46, 58-59 (*UCSB*);[5] *USC I*, *supra*, 246

---

[5]     The *UCSB* case concerns a public university, which is subject to federal constitutional guarantees not applicable to private colleges and universities. Nevertheless, the case is

Cal.App.4th at pp. 241-244), not allowing the respondent to submit questions for the panel or adjudicator to ask the complainant and other witnesses (*Westmont*, at pp. 638-639; *USC III*, at pp. 1237-1238; *UCSB*, at pp. 46, 60; *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1057-1058 (*Claremont*)), and failing to ensure witnesses appear, directly or indirectly, for cross-examination (*Allee*, *supra*, 30 Cal.App.5th at p. 1039; *USC III*, at pp. 1215-1216, 1237-1238; *Claremont*, at pp. 1057-1058, 1070).

In *Westmont*, *supra*, 34 Cal.App.5th 622 the court summarized the requirements for a fair hearing. The court emphasized that a college disciplinary proceeding is not like a criminal proceeding: "A college's procedure for investigating and adjudicating student sexual misconduct allegations is not analogous to a criminal proceeding. [Citation.] . . . [¶] A fair hearing strives to balance three competing interests: The accused student seeks ""to avoid unfair or mistaken exclusion from the educational process."" [Citation.] The college tries to provide a safe environment for all of its students. [Citation.] The alleged victim—who often "live[s], work[s], and stud[ies] on a

_____

instructive. (See *Westmont*, *supra*, 34 Cal.App.5th at p. 634 ["[t]he common law requirements for a fair hearing at a private college 'mirror the due process protections at public universities'"]; *USC III*, *supra*, 29 Cal.App.5th at p. 1232, fn. 25 [public university "'[d]ue process jurisprudence may be "instructive" in cases determining fair hearing standards for student disciplinary proceedings at private schools'"]; *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1057-1058, 1067, fn. 8 ["[federal] [d]ue process jurisprudence . . . may be 'instructive' in cases determining fair hearing standards for student disciplinary proceedings at private schools"].)

19

shared college campus'" with the accused—wants to safeguard his or her own well-being. [Citation.] [¶] These competing interests 'must be addressed in light of the nature of a [college] and the limits of its resources.' [Citation.] A college's primary purpose is education. [Citation.] Hearing requirements that are too formal and rigid divert resources and attention from that purpose. [Citation.] Accordingly, 'all the safeguards and formalities of a criminal trial' are not required. [Citation.] 'Although [a college] must treat students fairly, it is not required to convert its classrooms into courtrooms.'" (*Westmont*, at pp. 634-635; see *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1078 (*UCSD*) ["""[p]rocedures for dismissing college students [are] not analogous to criminal proceedings and could not be so without at the same time being both impractical and detrimental to the educational atmosphere and functions of a university"""]; *Doe v. University of Kentucky* (6th Cir. 2017) 860 F.3d 365, 370 ["school disciplinary proceedings, while requiring some level of due process, need not reach the same level of protection that would be present in a criminal prosecution"].)

The court in *Westmont* explained: "'[N]o particular form of student disciplinary hearing is required under California law.' [Citation.] . . . At a minimum, the college must comply with its own policies and procedures. [Citation.] Those procedures must provide the accused student with a hearing before a neutral adjudicatory body. [Citation.] The accused must be permitted to respond to the evidence against him or her. [Citations.] The alleged victim and other critical witnesses must appear before the adjudicatory body in some form—in person, by video conference, or by some other means—so the body can observe their demeanor. [Citations.] This is because "'the opportunity to

20

question a witness and observe [his or her] demeanor while being questioned can be just as important to the trier of fact as it is to the accused." [Citation.]' [Citation.] 'Recognizing the risk that an accusing witness may suffer trauma if personally confronted by an alleged assailant at a hearing, [the *USC I* court observed] that mechanisms can readily be fashioned to "provid[e] accused students with the opportunity to hear the evidence being presented against them without subjecting alleged victims to direct cross-examination by the accused." [Citation.]' [Citation.] It is not necessary to place the alleged victim and the accused in the same room.   [Citation.]   [¶]   The college must provide the accused student with the names of witnesses and the facts to which each testifies.  [Citations.]  The accused must be able to pose questions to the witnesses in some manner, either directly or indirectly, such as through the adjudicatory body.  [Citations.] The body need not ask every question proposed by the accused." (*Westmont*, *supra*, 34 Cal.App.5th at p. 635.)

In particular, direct cross-examination of a complainant by a respondent is not only not required, it is inappropriate.  "In administrative cases addressing sexual assault involving students who live, work, and study on a shared college campus, cross-examination is especially fraught with potential drawbacks."  (*USC I*, *supra*, 246 Cal.App.4th at p. 245; accord, *Claremont*, *supra*, 25 Cal.App.5th at p. 1067.)  As the United States Department of Education Office for Civil Rights once observed, "Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetrating a hostile environment."  (U.S. Dept. of Ed., Off. for Civil Rights, "Dear Colleague" letter, Apr. 4, 2011, p. 12 < https://www2.ed.gov/about/offices/list/ocr/letters/

21

colleague-201104.pdf > [as of Aug. 9, 2019], archived at
<https://perma.cc/PEF7-3ZVC>; withdrawn by U.S. Dept. of Ed.,
Off. for Civil Rights, "Dear Colleague" letter, Sept. 22, 2017,
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-
201709.pdf> [as of Aug. 9, 2019], archived at <https://perma.cc/
8YTD-59M8>.)[6]

### 2.    *John's Hearing Was Fair*

Occidental hired independent investigators to investigate
Jane's complaint.  As prescribed by Occidental's policy, the
investigators did not determine responsibility.  The hearing
coordinator made a threshold determination the evidence
warranted a hearing and informed John and Jane of that
determination.  She also gave them written notice of the conduct
underlying the alleged policy violations.  In doing so, the hearing
coordinator did not assess credibility or determine responsibility.
Jane and John each had an opportunity to review the
investigation report and the witness interview summaries.
Advisors assisted Jane and John and attended the hearing with
them.  The witnesses, including Jane, appeared in person.  John
proposed questions before and during the hearing for the
adjudicator to ask Jane, and the adjudicator asked some of them.

---

[6]    In November 2018 the Department of Education Office for
Civil Rights issued proposed Title IX regulations pursuant to
which, among other things:  a person may not serve as both
investigator and adjudicator; live hearings are required; and an
accused student's advisor may cross-examine the accuser and
other witnesses, either in person or with technology that allows
the decision-maker and the parties to simultaneously see and
hear the witness. (Proposed Regulations, § 106.45, subds. (b)(3),
(b)(4) (2018).)

The adjudicator heard the evidence and determined by a preponderance of the evidence John had violated the policy. Occidental's policy complied with all the procedural requirements identified by California cases dealing with sexual misconduct disciplinary proceedings: both sides had notice of the charges and hearing and had access to the evidence, the hearing included live testimony and written reports of witness interviews, the critical witnesses appeared in person at the hearing so that the adjudicator could evaluate their credibility, and the respondent had an opportunity to propose questions for the adjudicator to ask the complainant. (See generally *Westmont, supra,* 34 Cal.App.5th at p. 635.)

3. *John's Contentions the Hearing Was Unfair Are Meritless*

John argues his hearing was unfair because the hearing coordinator excluded a "charge evaluation worksheet" indicating the Los Angeles County District Attorney's Office had declined to prosecute John criminally. John also argues the hearing coordinator and the independent adjudicator were biased. Each of these arguments lacks merit.

a. *John's arguments concerning the charge evaluation worksheet are forfeited and do not support mandamus relief*

The district attorney's office gave counsel for John a copy of a "charge evaluation worksheet" reflecting the district attorney's decision not to prosecute John. Counsel forwarded the worksheet to Occidental's investigators. The investigators commented in their report that counsel for John had sent them the worksheet.

The investigators attached the worksheet as an exhibit, but they did not discuss it in their report.[7]  Someone, presumably the hearing coordinator, later redacted the exhibit from the investigator's report.[8]

John argues the adjudicator precluded him from using the worksheet to impeach witnesses at the disciplinary hearing.  In particular, John contends he wanted to use this statement in the worksheet:  "Witnesses were interviewed and agreed that the victim and suspect were both drunk, however, that they were both willing participants exercising bad judgment."  John contends the adjudicator "effectively precluded [him] from impeaching any witness who spoke with [police] investigators and later told [Occidental's] investigators that Jane was *not* a willing participant."

There is nothing in the record of the disciplinary hearing, however, reflecting John ever sought to use the worksheet at the hearing or to question any witness about what he or she told the police.  Nor is there any record the hearing adjudicator or

---

[7]    The copy counsel for John gave the investigators was heavily redacted.  The record does not show whether someone redacted it before or after counsel for John received it from the district attorney's office.

[8]    Occidental's sexual misconduct policy authorized the hearing coordinator to "review the investigative report, any witness statements[,] and any other documentary evidence" and to "redact information that is irrelevant, more prejudicial than probative, or immaterial," "statements of personal opinion, rather than direct observations or reasonable inferences from the facts, and statements as to general reputation for any character trait, including honesty."

coordinator ever precluded John from impeaching any of the witnesses with the worksheet. John did not argue at the disciplinary hearing, in his administrative appeal, or in the trial court he wanted to use or was precluded from using the worksheet for impeachment purposes.[9] By failing to make the argument until his appeal to this court, John forfeited it. (See *USC III*, *supra*, 29 Cal.App.5th at p. 1230 ["[g]enerally, a party cannot raise new issues . . . for the first time on appeal"]; *USC II*, *supra*, 28 Cal.App.5th at p. 37 ["[b]ecause this issue was not raised during the administrative proceedings or in the superior court, . . . [the university] did not have an opportunity to address it; and it would normally be deemed forfeited"]; *id.* at p. 41 [appellant forfeited the argument the university compromised his ability to gather evidence to defend himself by not raising the issue in his administrative appeal and raising it "only . . . in passing" in the trial court].)

In any event, even if John had sought to impeach someone with the worksheet and the adjudicator had precluded him from doing so, any error in such a ruling would have been harmless. (See *Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200 ["it is well settled that the improper admission or rejection of evidence at an administrative hearing does not provide 'grounds for reversal unless the error has resulted in a miscarriage of justice'" and it is "'reasonably probable a more favorable result would have been reached absent the error'"]; *McCoy v. Board of Retirement* (1986) 183 Cal.App.3d

---

[9] John briefly argued in his administrative appeal the worksheet was new evidence that was unavailable during the disciplinary hearing because it was redacted from the investigation report.

1044, 1054 ["[a]n administrative agency is not required to observe the strict rules of evidence enforced in the courts, and the admission or rejection of evidence is not ground for reversal unless there has been a denial of justice"].) Whether one of the witnesses at the hearing had made a prior inconsistent statement about Jane's willingness to engage in sexual activity with John would have had little if any impact on the adjudicator's conclusions Jane was, and John should have known she was, incapacitated due to intoxication. The question the adjudicator decided was not whether witnesses thought Jane was willing, but whether Jane was able to make "an informed and rational decision to engage in sexual activity." Thus, even if John had attempted to impeach one or more of the witnesses with the worksheet, there is no reasonable likelihood the result would have been any different.

    b.    *The hearing coordinator was not biased*

John argues the hearing coordinator was, or appeared to be, biased against him because she made a post-investigation threshold determination there was sufficient information from which an adjudicator could find John violated Occidental's sexual misconduct policy and she released information to be considered at the hearing only five days prior to the hearing. John also complains that the hearing coordinator was "vested with the opportunity to 'impose an appropriate sanction' in consultation with the Title IX Coordinator" and that the policy required the hearing coordinator to attend all meetings with the adjudicator and to advise the adjudicator on policy and procedure.

John's obligation "is to demonstrate actual bias. A disciplinary decision may not be invalidated solely on the basis of

an inference or appearance of bias." (*Allee*, *supra*, 30 Cal.App.5th at p. 1060; see *Occidental*, *supra*, 37 Cal.App.5th at p. 1018 ["'A party seeking to show bias or prejudice on the part of an administrative decision maker is required to prove the same "with concrete facts: '[b]ias and prejudice are never implied and must be established by clear averments.'"'"]; *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 220 [same].) A "'mere belief that [a school official] acted with . . . ulterior motives is insufficient to state a claim for relief.'" (*Allee*, at pp. 1060-1061.)

John has not shown actual bias. Unlike the policies of some colleges and universities, Occidental's policy does not have a college or university official serving in a dual role as both investigator and adjudicator. (See *Allee*, *supra*, 30 Cal.App.5th at p. 1061 ["[t]he fact finder may not be a single individual with the divided and inconsistent roles [of investigator and adjudicator]".) And even if Occidental's policy had such a feature, that without more would not be sufficient to show actual bias. (See *Westmont*, *supra*, 34 Cal.App.5th at p. 637 ["'"[t]he combination of investigative and adjudicative functions does not, without more,'" deprive a student accused of sexual misconduct of a fair hearing"]; *USC III*, *supra*, 29 Cal.App.5th at p. 1235, fn. 29 ["[a]lthough the Title IX investigator held dual roles as the investigator and adjudicator, 'the combination of investigative and adjudicative functions does not, without more, constitute a due process violation'"].) Moreover, in making her threshold determination, the hearing coordinator here played no role in determining whether John violated the sexual misconduct policy, did not make any findings on credibility or recommendations regarding responsibility, and did not participate in the adjudicator's decision. The hearing coordinator attended

27

pre-resolution meetings and the disciplinary hearing only "to serve as a resource for the [adjudicator] on issues of policy and procedure, and to ensure that policy and procedure [were] appropriately followed throughout the hearing."[10] And the hearing coordinator participated in the sanction decision only after the adjudicator concluded John had violated the policy.[11] The coordinator's participation in that decision did not reflect any bias that negatively affected John or influenced the adjudicator's decision.

John argues the hearing coordinator "unfairly released information that was to be used at the hearing . . . just five days before [the hearing]—knowing that [John], an 18-year-old freshman without any legal background—bore the responsibility of defending himself in [Occidental's] process." But when the hearing coordinator released the investigation report and summaries of witness statements to John and Jane, she was not

---

[10] Occidental's policy provides: "The Hearing Panel [or single adjudicator as here] is supported by the Hearing Coordinator, who is present at hearing panel meetings, but is not . . . a voting member of the panel. He or she will meet with all involved parties prior to the hearing, be present during the hearing to serve as a resource for the hearing panel on issues of policy and procedure, and to ensure that policy and procedure are appropriately followed throughout the hearing."

[11] The policy states: "If the [hearing] panel [or adjudicator] finds the Respondent responsible, the panel will then recommend appropriate sanctions to the Hearing Coordinator. The Hearing Coordinator, in consultation with the Title IX Coordinator, will review the recommendations and impose an appropriate sanction."

28

exhibiting bias, she was complying with the policy to release this information "at least five (5) business days prior to the hearing."[12] John has not cited any authority holding that five business days is insufficient or unfair. Nor is it accurate to say John was "defending himself." John was represented by counsel (although not at the hearing), who was able to assist John and his advisor to prepare for the hearing. Finally, John does not identify any prejudice he suffered by not having the information from the hearing coordinator any sooner, nor does he argue what, if anything, he would have done differently with additional time to prepare for the hearing. (See *USC II*, *supra*, 28 Cal.App.5th at p. 40 ["Doe does not indicate how his delay in reviewing" the information showing his academic dishonesty "prejudiced his case"].)

*Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, on which John relies, is distinguishable. In that case an assistant city attorney advocated for the city in connection with the plaintiff's attempts to renew a permit to operate a cabaret. After the city denied the plaintiff's permit application, the same assistant city attorney advised the decisionmaker on the plaintiff's administrative appeal of the decision to deny the permit. (*Id.* at pp. 84-86, 96.) The court held the assistant city attorney's dual role as advocate and adjudicator violated the plaintiff's due process rights. (*Id.* at pp. 86, 97-98.) Here, in contrast, the hearing coordinator did not act as an advocate or adjudicate John's responsibility. As discussed, in making her threshold determination the investigation report

---

[12] The hearing coordinator made the relevant materials available to Jane and John on Sunday, December 1, 2013 at 9:00 p.m. The hearing was on Saturday, December 7, 2013.

29

contained "sufficient information upon which an adjudicator could find a violation of the [sexual misconduct] policy," the hearing coordinator did not make findings on credibility or fault.

      c.      *The independent adjudicator was not biased*

John argues the adjudicator was biased and "antagonistic" toward him because she refused to ask Jane 29 of the 38 written questions he submitted.[13]  John asserts the unasked questions "were designed to illustrate for the adjudicator that [Jane] had made statements indicating her consciousness and awareness before, during, and after the sexual activity, undermining her claim of incapacitation."  John concludes that, "[h]ad [these] additional 29 questions been posed to [Jane], the frailty of her tenuous claim, and her dubious credibility, would have become more apparent [to the adjudicator].  Specifically, [the adjudicator] would have been exposed to evidence demonstrating that [Jane] was able to recall extensively the events that occurred, undermining [Jane's] claim that she had experienced 'blackouts' and incapacitation."

John has again failed to show bias.  Under Occidental's policy, the adjudicator had the discretion not to ask questions that were inappropriate, irrelevant, or cumulative.[14]  There is

---

[13]    John also proposed questions for the adjudicator to ask several of the witnesses, but he does not argue the adjudicator evidenced any bias in asking or not asking any of those questions.

[14]    Occidental's policy provides that "the parties may submit questions to the hearing panel [or, as here, the adjudicator] in writing, which may be posed at the discretion of the hearing panel [or adjudicator]."

nothing unfair about granting the adjudicator this kind of discretion.  (See *Westmont, supra*, 34 Cal.App.5th at p. 635 ["[t]he [adjudicatory] body need not ask every question proposed by the accused"]; *Claremont, supra,* 25 Cal.App.5th at p. 1073 ["granting the fact finder discretion to exclude or rephrase [proposed] questions" is appropriate and "strikes a fair balance among the interests of the school, the accused student, and the complainant"]; *UCSD, supra*, 5 Cal.App.5th at p. 1085 [permitting the hearing panel chair to screen the accused's written questions and ask only those questions that are not repetitive or irrelevant did not, "as a procedural concern," render the hearing unfair].)

Nor has John shown the adjudicator's failure to ask all of the questions he proposed caused him prejudice.  (See *UCSD, supra*, 5 Cal.App.5th at p. 1086 [adjudicator's failure to ask or paraphrase certain questions did not prejudice the appellant]; *id.* at p. 1088 [adjudicator's "decision not to ask Jane question No. 4 did not prejudice John whatsoever"].)  Only five of John's proposed questions concerned statements Jane made about what she remembered.  Four of those five questions concerned what Jane told the investigators, and the fifth was whether Jane told people the day after the incident she had a hard time remembering what had occurred.[15]  Jane's responses to those

_____

[15]     (1) "Did you tell the investigators that John told you to come back down 'so he can fuck you?[']" (2) "The next day, Sunday, did you tell people that you had a difficult time remembering what happened that night?" (3) "But in your statement, you told the investigators about a number of things that you do remember happening about that time, correct?" (4) "You told the investigators that you remembered asking John if

31

questions would have been cumulative or, as the trial court found, "duplicative of evidence already in the record." The investigation report, the investigators' summary of Jane's interview, the lead investigator's testimony at the hearing, Jane's testimony, and the testimony of the five students, all included statements about what Jane said she remembered. The adjudicator knew what Jane told the investigators and other students about what she remembered. The adjudicator considered the extent to which Jane did or did not remember her encounter with John and the surrounding events. The adjudicator found: "[Jane] states, and the external adjudicator believes, she has no recollection of having sexual intercourse with [John]."[16]

John also asserts the adjudicator "demonstrated curt and contentious reactions to [him]." He relies solely on the following exchange, which occurred during his opening statement: "[John:] So, to reiterate again, I didn't sexually assault Jane Doe. I would never and could never do something like that. And the police

---

he had a condom because you had not used any birth control, is that right?" (5) "You told the investigators that you remembered performing oral sex on John when you were in his room, correct?"

[16] Eleven additional questions John proposed asked whether Jane remembered specific events, for example, "You remember giving John your cell phone number . . . ." Five questions asked whether Jane had sent specific text messages.* And one question asked Jane to draw a legal conclusion: "So even if you don't remember now, or have blocked it out, at the time you and John had sex in his room, you were conscious and aware, isn't that right?"
    * As stated, Jane testified she did not remember sending any text messages.

investigation agrees. [¶] [The Adjudicator]: I'd like to stop you from any reference to the police investigation, please." Of course, a hearing transcript does not convey the speaker's tone of voice. But there was nothing inherently curt or contentious about the adjudicator's statement. Nor does the hearing transcript contain any evidence the adjudicator was curt to or contentious with John at any other time during the proceeding. To the contrary, the record reflects the adjudicator was consistently polite to all participants.

### d. *There was no "cumulative impact"*

John contends "this Court should find that the cumulative impact of how [Occidental] conducted its disciplinary proceeding against [him] contains a notable stench of unfairness." As discussed, there was no instance of unfairness, let alone cumulative unfairness.

### C. *There Was Substantial Evidence John Should Have Known Jane Was Incapacitated*

"When reviewing a university's disciplinary actions, "'[t]he power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding." [Citation.]' [Citation.] . . . '[T]his does not mean we must blindly seize any evidence in support of the [determination] in order to affirm the judgment . . . . "[I]f the word 'substantial' [is to mean] anything at all, it clearly implies that such evidence must be . . . reasonable . . . , credible, and of solid value . . . ." [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have [made the findings] based on the *whole*

33

record.'" (*USC I, supra*, 246 Cal.App.4th at pp. 248-249; see *M.N. v. Morgan Hill Unified School Dist.* (2018) 20 Cal.App.5th 607, 616 ["[t]he court must 'accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the [administrative decision"'].) "'Credibility is an issue of fact for the finder of fact to resolve . . . .'" (*M.N.*, at p. 616; accord, *Occidental, supra*, 37 Cal.App.5th at p. 1019.)

There was substantial evidence that Jane was incapacitated and that, despite her possible apparent assent, a sober person in John's position should have known she was incapacitated. Jane was extremely intoxicated. In John's presence, Jane drank at least three or four shots of vodka and was stumbling and leaning on walls and furniture for support. Angela, in John's presence, told Jane to stop drinking, and Angela repeatedly tried to take the vodka bottle away from Jane. According to Angela, Jane was too drunk to know what she was doing, where she was, or where she was going. When Jane returned alone to John's room, she told him she had just vomited. Jane's intoxication increased while she was alone with John. When she left John's room, Jane was, according to her roommate, "past drunk." The next morning, Jane suspected but did not know whether she had sex with John. The adjudicator reasonably concluded that Jane was unable to make "an informed and rational decision to engage in sexual activity" and that John, had he been sober, should have known it.

34

## DISPOSITION

The order denying John's petition for a writ of mandate is affirmed.  Occidental is to recover its costs on appeal.



SEGAL, J.


We concur:



PERLUSS, P. J.



STONE, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 9/23/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>OCCIDENTAL COLLEGE,<br><br>    Defendant and Respondent. | B284707<br><br>(Los Angeles County<br>Super. Ct. No. BS147275)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION; NO CHANGE IN APPELLATE JUDGMENT** |

THE COURT:

The opinion in this case filed August 27, 2019 was not certified for publication.  Because the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the respondent's request for publication under California Rules of Court, rule 8.1120(a), is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the opinion be published in the Official Reports.

This order does not change the appellate judgment.

PERLUSS, P. J.                SEGAL, J.                STONE, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.