Filed 9/30/21; certified for publication 10/19/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN DOE,<br><br>        Plaintiff and Appellant,<br>v.<br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Defendant and Respondent. | A159004<br><br>(Alameda County<br>Super. Ct. No. RG19007666) |

John Doe was a student at University of California, Davis (UC Davis), when fellow student Jane Roe reported that he engaged in nonconsensual sexual intercourse with her in violation of University of California policy. John agreed they had sex but said Jane consented. Following an investigation, UC Davis found that, on the night John and Jane had sex, Jane was incapacitated due to alcohol such that she was unable to consent and that, given her condition, a reasonable person should have known she was unable to consent. UC Davis concluded John violated explicit UC policy, and he was suspended from all UC campuses for two years. John petitioned the superior court for a writ of administrative mandate to set aside the suspension, and the court denied the petition.

In this appeal, John contends he was denied a fair process in UC Davis's investigation and adjudication of Jane's allegations. He argues (1) he

1

was denied a live hearing and an opportunity to cross-examine witnesses before a fact finder who was not also the investigator, (2) the investigator in this case failed to conduct a fair, thorough, and impartial investigation, and (3) the findings were not supported by substantial evidence.

In *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1069 (*Allee*), the court held in university disciplinary proceedings involving allegations of sexual misconduct, when the sanction is severe and credibility is central to the adjudication, the university must provide cross-examination at a live hearing before a neutral adjudicator who was not also the investigator as a matter of fair process. We conclude that, in this case, credibility was not central because John's own account of the incident provided substantial evidence of the policy violation; therefore, the procedures mandated in *Allee* were not required. The administrative record shows the investigation was thorough, there is no evidence of investigator bias, and John was provided many opportunities to state his version of events and to review and respond to the evidence. On this record, we cannot say John was denied a fair process.

Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Relevant UC Davis Policies and Procedures*

     1.    <u>Investigating and Deciding Complaints</u>

The procedures for investigating and adjudicating claims at the time Jane filed her complaint and John was disciplined were the UC Policies Applying to Campus Activities, Organizations and Students–Appendix E: Sexual Violence and Sexual Harassment Student Adjudication Framework issued January 1, 2016 (Appendix E) and the UC Davis Adjudication of Student Cases of Sexual Violence and Sexual Harassment Policy dated April 21, 2017 (together, the "Procedures"). The Procedures are no longer in effect,

2

and the process for adjudicating sexual misconduct claims in the UC system is no longer governed by the April 2017 version of Appendix E.[1]

Each University of California campus has a Title IX Office responsible for receiving and responding to reports of sexual violence and sexual harassment. When a Title IX Officer receives a report of alleged sexual violence or sexual harassment warranting investigation, the officer designates an investigator "to conduct a fair, thorough, and impartial investigation." The person who made the complaint and the person accused of misconduct are given written notice of the charges and a summary of the investigative and adjudicative process.

When the investigator completes the investigation, she prepares a written report, which includes findings of fact and a recommendation regarding whether there were any policy violations. The parties are sent written notice of the findings and recommendations, and an explanation of the decision-making process and the subsequent right to file an administrative appeal.

It is the Office of Student Support and Judicial Affairs (OSSJA) that decides whether any policy violations occurred and determines the appropriate discipline. Either party may schedule a meeting with the OSSJA or submit a written statement to address the findings and recommendations and potential discipline. The OSSJA reviews the investigation report and the parties' comments and decides whether to accept the recommendations of the

---

[1] Even though both parties note that the Procedures are no longer in effect, for simplicity and clarity we refer to them in the present tense. (Respondent UC Regents reports its adjudication policies have most recently been modified following the issuance of new Title IX regulations by the Department of Education. John states the Procedures were rescinded in March 2019 after *Allee, supra,* 30 Cal.App.5th 1036, was decided.)

3

investigator. Written notice of the OSSJA decision is sent to the parties; the notice includes an appeal form and description of the administrative appeal procedure.[2]

Administrative appeals are decided by an "appeal hearing officer." The appeal procedures require notice and the exchange of witnesses, witness summaries, and documents prior to the hearing.[3] After the appeal hearing, the appeal hearing officer renders her decision and issues a written report. If the appeal hearing officer upholds the findings and disciplinary sanctions, there is no right to further administrative appeal. If the OSSJA's decision is modified or overturned, the parties may appeal to the Chancellor.

2. Policies Governing Student Conduct

The UC Policy on Sexual Violence and Sexual Harassment issued January 1, 2016, (UC Policy) defines and prohibits certain sexual misconduct. Pertinent here, it prohibits "[s]exual [a]ssault – [p]enetration," which it defines as "Without the consent of the Complainant, penetration, no matter how slight, of the vagina, anus, or mouth by a penis; or the vagina or anus by any body part or object."

The UC Policy defines "consent" as "*affirmative, conscious, voluntary, and revocable*" and provides, "It is the responsibility of each person to ensure

---

[2] The Procedures allow either party to contest the OSSJA's decision by submitting an appeal on one or more of the following four grounds: (1) procedural error that materially affected the outcome, (2) "[t]he decision was unreasonable based on the evidence," (3) new, material information, or (4) disproportionate discipline.

[3] For example, the parties are required to submit to the appeal hearing officer "the information they intend to present at the appeal, including all documents to be presented, the names of all witnesses, and a brief summary of all witnesses' expected testimony" at least five days before the hearing. The information is then provided to the parties.

4

they have the affirmative consent of the other to engage in the sexual activity." The definition further provides, "The Respondent's belief that the Complainant consented shall not provide a valid excuse where" either "[t]he Respondent did not take reasonable steps, in the circumstances known to the Respondent at the time, to ascertain whether the Complainant affirmatively consented" or "[t]he Respondent knew or a reasonable person should have known that the Complainant was unable to consent because the Complainant was incapacitated in that the Complainant was" "asleep or unconscious" or "due to the influence of drugs, alcohol, or medication, unable to understand the fact, nature, or extent of the sexual activity."

The UC Davis Policy on Student Conduct and Discipline (Code of Conduct) prohibits "physical abuse," which includes "physical assault; threats of violence; or other conduct that threatens the health or safety of any person."

As we will discuss, whether Jane was able to consent within the meaning of the UC Policy is central to the outcome of this appeal.

B.    *Incident and Complaint*

In December 2017, UC Davis student Jane and her roommate Witness A shared a room on the first floor of a residence hall; John lived on another floor of the same building.[4] It is not disputed that, on the evening of Saturday, December 2, 2017, a group of students including John were hanging out in Jane's dorm room, Jane drank a good deal of alcohol and ended up vomiting and falling asleep in a shared residence hall bathroom, and later that night, John and Jane had sex.

---

[4] The administrative record refers to the studentwitnesses as Witness A, B, and so on. The parties refer to John Doe and Jane Roe with pseudonyms to protect their privacy, and we do the same.

5

On January 26, 2018, Jane reported to the Title IX Office that John had engaged in nonconsensual sexual intercourse with her.

## C. *Investigation*

Wendy Lilliedoll, of the Office of the Provost and Executive Vice Chancellor, was assigned to investigate the matter. On February 6, 2018, Jane and John were each sent notice of the investigation. The three-page notice to John identified Jane as the complainant, stated the allegation that John engaged in sexual intercourse without Jane's consent in her dorm room on or about December 2, 2017, and referred to the university policies alleged to have been violated. These were the UC Policy prohibiting "Sexual Assault – Penetration" and the Code of Conduct prohibition of physical assault. The notice explained the investigation process and provided websites where the UC Policy, the Code of Conduct, and the Procedures could be found.

### 1. Witness Interviews

Over the course of March and April 2018, Lilliedoll met in person with Jane, John, and five additional witnesses—students she referred to as Witnesses A, B, C, D, and E.[5]

#### a. *Jane*

Jane told Lilliedoll that on the night of December 2, 2017, she was hanging out with some friends, and John, whom she did not know well, was there, too. Jane "definitely consumed far too much" alcohol that night, probably eight or nine shots or so.

---

[5] Jane and Witness A shared a room on the first floor near the front door of their residence hall. John and Witness E were roommates and lived on the second floor of the same residence hall. Witness B and Witness D were roommates and also lived on the second floor. Witness C lived in a different dorm and was good friends with John.

Jane ended up vomiting in the gender-neutral bathroom in the residence hall.  John went with her to the bathroom.  She told him she was fine and he did not need to be there, but John insisted on staying with her and told her she needed to take off her shirt.  Jane kept saying "no" and pushing him away.

When Jane and John returned from the bathroom to her dorm room, most people had left; only her roommate, Witness A, and one other friend were still there.[6]  Jane told Lilliedoll she was "really out of it" at that point and she did not remember what John said, but Witness A later told her that John said he was going to do his homework in her room and make sure she was okay.  John went to get his backpack.  Jane was in bed trying to sleep when he returned.

According to Jane, she did not remember exactly what happened that night.  She thought John sat in a rolling chair and worked while Witness A was in the room but as soon as she left, John got into bed with her.  Jane was "half asleep" and "not with it."  She told Lilliedoll, "He, I guess, just took advantage of me.  I was not in any state to give consent, which was really obvious."  Lilliedoll asked about what specific acts occurred, and Jane responded, "He had sex with me.  There was a point where I realized what was happening and said, 'Oh shoot, I don't want to be doing this.'  I think that's when I got up and put on my pajamas.  I think my thought process was if I got ready for bed he would leave."  She told John she wanted to go to sleep; he tried taking off her pajamas.  Jane said, "He didn't really listen when I said I wanted to sleep."  She thinks he managed to take off her pajamas and to continue to have sex with her.  Asked whether there was any

---

[6] From the accounts of John and Witness D, the other person in the room was Witness D.

other sexual activity, Jane did not remember any oral sex or genital touching. She remembered falling asleep multiple times; John kept waking her up. Asked about contraception, Jane recalled that John had condoms. At the time of her interview with Lilliedoll (March 15, 2018), Jane told Lilliedoll that she should have been more direct in telling John to leave, but she also thought that she was not coherent enough at the time to do that.[7]

        b.    *John*

Lilliedoll interviewed John in April 2018 and gave him a summary of the interview a few days later, inviting him to identify any inaccuracies or clarifications. John provided his comments, which Lilliedoll then incorporated into an interview summary.

John reported that Jane and Witness A invited him and his friend, Witness C, to a party in their room, and everyone started drinking. John thought Jane had about six drinks.

John said he did not have too much to drink that night, and he was mostly making sure people who did have too much were okay. Witness A asked him to check on Jane in the gender-neutral bathroom. He found her in the disabled stall, in his words, "purging," sometimes slouched over with her head in the toilet bowl. John's friend, Witness C, was in another stall, and John went to see if he needed anything. He brought water to both Jane and Witness C. Witness C said he was done for the night, and John helped him up the stairs to John's room and put him in a spare bunk.

John went back downstairs and found Jane still in the bathroom. She was lying face up on the bathroom floor with her legs straddling the toilet,

---

    [7] Jane also told Lilliedoll that she just wanted to forget about what happened at first, but, later, she was motivated to file a complaint when she heard about an incident involving John and other female classmates that occurred during the winter quarter.

and John was concerned she might be choking.  He quickly lifted her up, put her head over the toilet, and patted her back.  He noticed she was really cold to the touch.  She said her back and chest hurt; he asked if she wanted him to unhook her bra, and she said yes, so he unhooked it over her shirt.  John told Lilliedoll he got the idea because at another party where he was not drinking someone asked him if he could help her unhook her bra.  He offered Jane more water, and she said she could not drink more water and she just needed to throw up.

At one point, John left the bathroom.  When he returned, he found Jane and Witness A asleep on the floor.  Jane had her legs straddling the toilet, and Witness A was sitting behind Jane.  It was getting late, so he suggested that Witness A end the party in her room.  He asked Jane if he could help her, and she told him to leave her by the toilet.  He put her in a position where she was hunched over the toilet.

John thought he gave Jane at least half an hour to finish up in the bathroom.  During this time, she fell asleep again.  Eventually, he asked Jane if she was done, and she said she thought she was, so he helped her to her feet.  She pushed him away and said she could walk by herself, but she slipped, and John caught her and helped her back to her room.

When John and Jane returned to her room, Witness D was there.  John told him he could go back to his room because Jane had to go to sleep.  Witness A (Jane's roommate) told John he could leave, but he asked if he could do homework in their room so he could watch Jane to make sure she fell asleep safely.  John and Witness A put Jane to bed with a wastebasket nearby.  Jane drooled into the basket and made a lot of gurgling noises, but John did not recall her vomiting again.  He thought her stomach was empty because she was refusing to drink water.

John ran upstairs to get his backpack. When he returned to Jane's room, Witness A was asleep but Jane was having a hard time sleeping. Jane kept saying, "I'm cold" in a "shivery, fluttery voice," and John tucked her in as well as he could. He put on headphones and started working on an assignment.

At some point, Witness A asked if he would stay around while she went out. He thought it was possible Witness A couldn't sleep because Jane was groaning.

John took his headphones off and heard loud groaning. Jane complained that she was too cold to fall asleep. John told Lilliedoll he was really warm from all the walking he had been doing, so he asked Jane if she wanted him to get under the covers and keep the bed warm, and she said yes.[8] He took off his jeans and button-up shirt and got in bed with Jane, wearing a t-shirt and basketball shorts. Jane started coming closer to him and spooning him, and he felt "super uncomfortable" and was "hugging the wall." Jane was not wearing pants, and he guessed she took them off when he went upstairs. He started to fall asleep because the bed was warm; he thought it was around 11:30 p.m.

John told Lilliedoll he woke up at 2:30 a.m. with Jane's mouth on his mouth and her legs tangled in his. He asked what she was doing, and she asked if he had a condom. Jane said she wanted to "do it." He asked if she was kidding, and she said she wasn't. He asked if she was sober, and she said she was. John got out of bed and found a strip of about four condoms in his backpack.

---

[8] John told Lilliedoll he felt conflicted about what he was doing. He felt weird making the offer, but he would have felt bad if Jane stayed up all night shivering.

According to John, he went back to bed and asked Jane if she was sure about going through with this, and she said yes. She reached for his crotch. He asked again if she was sober, and Jane said he could stop asking those questions about consent. The sexual encounter began with John performing oral sex for several minutes. He told Lilliedoll that Jane reacted by saying, "ooo," and she seemed surprised and seemed to enjoy what he was doing.

John reported he then asked for permission to continue, Jane gave him permission, and they began to have sex. They started in the missionary position and changed positions twice. At one point, Witness A walked in the room to get something, and Jane said, "Oh shit," and pulled the sheets over herself. Witness A left the room, and John did not know if she saw what was happening.

John asked Jane if she was willing to perform oral sex. She said, "sure, give me a minute." She turned on the lights and started cleaning the room—she pushed clothes to the side of the bed, moved a wastebasket, and took her bra and perhaps her pants to the closet. She put on a t-shirt. She may have put on underwear or pajama bottoms. She got back into bed and made eye contact with John while she performed oral sex. This lasted a long time; John eventually asked if they should stop and go to bed.

John woke around 5:15 a.m. and was starting to get dressed when Witness A entered the room. He may have left a condom on the floor.

Later that morning (December 3), John talked to Witness B about what happened with Jane. He asked Witness B what Witness A told him. Witness B said he thought they (John and Jane) hooked up, and John confirmed this. John wanted to check up on Jane, and Witness B gave him her phone number.

11

John texted Jane, and she did not respond until the next day. She indicated she did not know what happened, and John texted, "Do you remember what happened?" He told Lilliedoll he wrote this because he thought Jane was "flirting." Jane responded that she thought she had too much to drink to remember.

At some point, John learned from Witness B that Jane had a boyfriend and that really "set [John] off" because he thought having sex with a girl who has a boyfriend is disrespectful to the boyfriend. John described to Lilliedoll his text message exchanges with Jane, since he had deleted the text message string. He texted Jane that he knew she had a boyfriend, and she responded that she loved her boyfriend and would never have sex with John of her own "free will." John texted that was not what she said at the time and he "made sure." John thought Jane was being "super irrational."

Before deleting the messages, John showed some of them to Witness B and asked what he thought Jane meant. According to John, Witness B told him it sounded like he did nothing wrong. John told Witness B he got in bed with Jane to help her stay warm. He wanted to take a quick nap and make sure she fell asleep and leave. He said he took his pants off because he couldn't sleep with three layers of clothing and also his pants were probably still wet from the drizzle because it was raining that day.

Regarding whether Jane was drunk when they had sex, John thought if she stopped drinking at 10:00 p.m., vomited until 11:30 p.m., and kept drinking water until 2:30 a.m., then she was not drunk. He thought she could not have been awake and had all that energy if she were drunk. He was confident he had "total consent."

John told Lilliedoll that when Jane was in the bathroom, she was slurring and spoke "hazily." But later, when they were in bed and she asked

12

if he had a condom, she did not slur. He said Jane sounded more like she was just waking up. He kept asking her if she was sober, and she started getting annoyed. After Witness A walked in on them having sex and then left the room, John and Jane talked about an activity Jane had the next morning. John said, "she seemed to have gotten back to herself" by that time.

      c.    *Witness A*

Jane's roommate, Witness A, confirmed that she and Jane had a party in their room on the night in question, and John and Witness C were there. A few hours into the party, Jane went to the bathroom. Witness A went to check on Jane, and it appeared John was being nice and helping her out. When Jane returned to her room from the bathroom, she was stumbling, unable to talk, and had her face in a trash can.

John put Jane in bed. Jane threw up in a trash can. John went to get his homework and said he would stay with her to make sure she was okay. Jane continued to vomit, which made Witness A feel disgusted and nauseated. Around 1:00 or 2:00 a.m., Witness A left their room to hang out in the hall with Witness B. At one point, she briefly went in the room to get something, and she saw John in bed with Jane; they appeared to be sleeping.

At 4:00 a.m., Witness A returned to her room to go to bed. John was getting out of Jane's bed. Later that morning, Jane was crying. Witness A asked whether John "took advantage of" her, and Jane said yes.

      d.    *Witness B*

Witness B said that, on the night of the party, Jane was in the bathroom throwing up and "wasn't doing so well" and John said he would help her. He confirmed that, much later that night, he and Witness A hung out outside her room.

13

A day or two after the party, John talked to Witness B about what happened. John told Witness B that Jane was sober and speaking clearly and they had sex.

e. *Witness C*

Witness C was good friends with John. On the night of the incident, he arrived at the residence hall around 9:00 or 10:00 p.m. Upperclassmen from John's fraternity bought them alcohol, and he and John took the alcohol to the party in Jane's room. Witness C did not observe any interactions between Jane and John at the party and did not sense there was romantic interest on either side.

Witness C saw Jane lying on the floor of a stall in the bathroom. "[S]he was not in a good state" and was "zonked out."

The next day or day after that, John visited Witness C and was really worried. He was not sure if he had done something wrong with Jane. Witness C understood from John's account that Jane was cold, John warmed her up by sitting or lying down next to her, and then Jane "got all touchy." According to Witness C, John said he was not sure whether the encounter was consensual or whether Jane was in the right state of mind. Witness C told Lilliedoll that he sometimes thinks John brags about things and may not be telling the truth. In this instance, however, John did not appear to be bragging; he expressed confusion and a bit of guilt.

f. *Witness D*

Witness D was briefly in Jane's room at the end of the party around 1:00 or 2:00 a.m. He saw John bring Jane into her room; he was holding her

up. Jane and Witness A were going to bed, so he went to his room and went to sleep.[9]

## 2. Evidence Gathered

Lilliedoll collected access card swipe data for John, Jane, and the five witnesses showing when their cards were used to enter the residence hall on the night in question. Witness D's card was used to enter the residence hall at 1:10 a.m. on December 3, 2017.

Lilliedoll obtained screen shots of text exchanges from the witnesses. Texts from Witness B's phone show that, on the afternoon of December 3, John asked him for Jane's and Witness A's numbers. John also asked Witness B to check with Witness A about whether John "did anything to piss her off."

## 3. John's Response to the Evidence Summary

In early May 2018, Lilliedoll sent the parties her evidence summary, informing them they could comment in writing and "suggest additional information you believe I should pursue."

John provided a preliminary written response on May 8 and a further written response on May 12, 2018. He gave his own written summary of events and responded to Lilliedoll's interview summary for Jane line by line.

In response to Jane's statement that she had eight or nine shots, John wrote, "She was pacing herself for most of the beginning [of the party] and probably started hammering drinks an hour or so before she started puking."

Responding to Jane's assertion that he tried to take her shirt off and she kept pushing him away in the bathroom, John wrote, "After she kept

---

[9] Witness E (John's roommate) was not with John on the night of the incident, but John told him about it. Witness E did not remember much detail about what was said, but he thought John told him that he initiated sex, Jane was on top at some point, and he "got a blow job."

15

gasping frantically and groaning about her back and chest pains (probably from hunching over the toilet for so long)[,] I asked her if she was okay with me unclasping her bra over her shirt first. She told me she was fine and didn't want me to do it then. Only after she continued complaining did I bring up the idea again, saying it would make her feel a whole lot [b]etter. Only after she said yes did I do it quickly without further intent.[10] [¶] I even asked her if she felt better and she said yes."

In response to Jane's statement that John took advantage of her and her general description that he had sex with her and she did not recall oral sex or genital touching, John went into greater detail describing their sexual interactions.

Responding to Jane's statement that she felt obligated to report the incident after she heard about a later incident involving John and some other women, John gave his version of the later incident, but he did not question Jane's truthfulness in explaining her motivation to file a complaint against him.

John proposed follow-up questions for Jane. Some questions assumed his version of events and asked why she acted as he said she did ("Why did she give me numerous accounts of consent and assurance that she was sober before and during the sex?" "Why did she ask me for a condom after she kissed me when we both woke up around 2?") Other questions asked whether she remembered certain very specific details of their sexual interaction. John

---

[10] In his written summary of events (which he apparently wrote before he provided his response to Lilliedoll's evidence summary), John wrote, "She complained about her back and chest hurting, so I tell her I'm going to help her by unhooking her bra and I did (over the shirt)." Here, he did not mention asking for permission before unhooking her bra.

did not suggest that Lilliedoll ask Jane about her boyfriend or about possible motivations for fabricating her complaint.

John also responded to the interview summaries for Witness A and Witness B and proposed follow-up questions. He did not dispute Witness A's description of Jane as stumbling and unable to talk when she returned from the bathroom. Nor did John dispute Witness B's description of the party.

### 4. Investigator's Follow Up

Lilliedoll considered all of John's proposed questions for Jane and Witness A, and she followed up with the questions she found material.[11] Lilliedoll also posed questions to John based on his written response to her evidence summary. John did not reply to Lilliedoll's questions.

### D. *Investigator's Report: Findings and Recommendations*

Lilliedoll completed her investigation report on May 23, 2018.

### 1. Credibility Findings

Lilliedoll found "issues with the reliability of both parties' accounts." Regarding Jane, Lilliedoll found "[t]he evidence suggested [she] was severely intoxicated," impacting her "ability to accurately observe and recall many relevant events." Lilliedoll considered John's suggestion that Jane may have fabricated her claim because John found out she had a boyfriend or because someone may have been "slut-shaming" her. Lilliedoll noted Witness A saw Jane crying the morning after the incident, before John learned Jane had a boyfriend, and before anyone would have "slut-shamed" her. Based on the timing of the complaint, Lilliedoll found credible Jane's explanation that she

---

[11] Lilliedoll met with Jane in person on May 16, 2018, to ask additional questions and corresponded with Witness A with follow-up questions. In her investigation report, Lilliedoll provided a table listing (1) each of John's proposed questions, (2) the question she asked or her basis for not asking the question, and (3) the response if applicable.

17

pursued the complaint because she heard about a concerning incident between some female classmates and John involving alcohol.

As to John, Lilliedoll observed that he "had a motive to exaggerate the evidence of consent because there are serious consequences associated with violating the [UC P]olicy."[12]  John mentioned that he removed his pants when he got into bed with Jane because they were wet from rain, but Lilliedoll checked a website for weather history and found "it did not rain in Davis on December 2, 2017."

### 2.    Factual Findings

Lilliedoll made 28 factual findings, which she supported with evidence or noted that the fact was undisputed.[13]  Her findings included the following. Jane and John returned from the bathroom around the 1:00 a.m. hour.[14] Around that time, Jane was stumbling (based on statements from Witness A), required help to walk (John), made gurgling noises and drooled (John), vomited into a trash can by her bed (Witness A), loudly groaned (John), and

---

[12] Lilliedoll pointed out that John expressed concern about whether he did something wrong with his good friend Witness C, but he was adamant with Witness B (a friend of Jane and Witness A) that he did nothing wrong and that Jane was sober.  To her, this suggested John may have been altering his account depending on his audience.

[13] Among other things, it was agreed that Jane and John did not flirt at the party, that Jane vomited in the bathroom as the result of intoxication, that John got into bed with Jane, and that they had sexual intercourse.

[14] Lilliedoll noted that John stated he thought they left the bathroom earlier, around 11:30 p.m., but she found other evidence supported a later timeline.  Witness D stated he was in Jane and Witness A's room only briefly around 1:00 or 2:00 a.m.  Door swipe records showed that Witness D entered the residence hall at 1:10 a.m., and Lilliedoll found it reasonable that he stopped by Jane's room at approximately that time.  Both John and Witness D reported that Witness D was in the room when John and Jane returned from the bathroom, so they likely arrived in Jane's room soon after 1:10 a.m.

18

was in a condition that prompted John to say he would sit with her to make sure she was okay (John, Witness A). Witness A left the room to meet Witness B around 2:00 a.m. because Jane's condition was impacting her ability to sleep.[15]

Lilliedoll rejected some of John's assertions. She found the preponderance of the evidence did not support that John "spent several hours studying and/or sleeping before any sexual activity occurred" and did not support that Jane "orally requested sexual activity with" John.[16]

3.     Recommendations

Lilliedoll recommended finding (1) that Jane did not provide "affirmative, conscious, and voluntary agreement" to sexual activity, (2) that Jane was incapacitated and a reasonable person in John's position should

---

[15] Lilliedoll noted that John initially stated that Witness A was out of the room from 2:00 a.m. to 5:00 a.m. Witness A thought she left the room around 1:00 or 2:00 a.m. Lilliedoll reasoned that Witness A leaving the room around 2:00 a.m. was "in line with [Jane] and [John] returning to the room after 1:10 a.m. (when Witness D swiped into the building), then [John] going upstairs to get his things and Witness A trying to sleep before eventually" leaving the room to hang out with Witness B.

[16] Lilliedoll did not credit John's account that Jane repeatedly stated she was sober and consented to sex in light of his earlier statements to his friends in which he failed to mention consent. She reasoned, "Witness C, who is a close friend of [John], said [John] explicitly expressed concern about whether the encounter was consensual. Given that conversation between [John] and Witness C, it would have made sense for [John] to have told Witness C that he repeatedly asked [Jane] if she was sure she wanted to engage in sexual intercourse and she said yes each time. However, Witness C stated that [John] did not tell Witness C about any conversation between the parties before the sexual activity other than [Jane] saying she was cold. According to Witness C, [John] said [Jane] got 'touchy' and he 'just went with it' because he liked it."

19

have understood her condition, and (3) that John did not take reasonable steps to evaluate consent.

E.    *John's Response to the Investigator's Findings and Recommendations*

On May 24, 2018, the parties were sent notice of the investigator's findings and recommendations and an electronic copy of the investigation report. The notice stated that the Director of the OSSJA, Donald Dudley, would make the final determination and that the parties had until June 5 to meet with the OSSJA or submit a written statement.

John submitted a written statement to Dudley. He suggested the witnesses may have "collaborate[d] in what they might have said to the Investigator" because they were friends with Jane. He argued the investigator "seem[ed] to have an opinion in mind about what happened." He asserted he had never been drunk before and did not know what it felt like. He repeated that Jane initiated intimate activity and asked, "How can I be found in trouble for having sex with someone who, while they consumed an amount of alcohol, made first contact?" John concluded, "In summary, what I want to have examined is who actually initiated the interaction and the number of times I got her consent to continue."

F.    *OSSJA's Decision*

On June 15, 2018, Dudley sent the parties notice of his decision. He agreed with Lilliedoll's recommendation that Jane did not express affirmative, conscious, and voluntary agreement to engage in sexual activity with John, noting that Jane "was surprised when [John] engaged in oral sex." Dudley also agreed that Jane "was incapacitated and therefore not able to give consent" and that John did not take reasonable steps given Jane's condition to ascertain whether he had affirmative consent. He determined

20

that the appropriate sanction was dismissal from the University of California.

G. *Administrative Appeals*

On June 29, 2018, John appealed the OSSJA decision on the grounds (1) the decision was unreasonable based on the evidence, (2) the investigation was not fair, thorough, or impartial, (3) there was new material evidence that undermined the claims, and (4) the disciplinary sanction did not fit the case. The purported new evidence was a letter by toxicologist Gary Lage describing the phenomenon of alcohol-induced memory loss of an event, also known as a "blackout." Lage wrote, "The fact that a person experiences alcohol-induced amnesia of actions they took while intoxicated, does not mean that they were too incapacitated to make voluntary decisions while they were intoxicated."

John argued the evidence showed Jane was able to understand the fact, nature, and extent of what happened that night, "or at the very least, it would have seemed that way to anyone in [John's] position." He noted that Jane did not remember that night, but he did, and asserted, "Indeed, almost all of what you know about that night—almost all of the evidence Ms. Lilliedoll cited in her analysis—comes from information that I provided."

Written notice of the hearing was sent to the parties. The appeal hearing officer limited the scope of the hearing to three of John's four grounds for appeal, excluding his claim of new evidence based on the Lage letter.[17] Jane's notice informed her that she was not obligated to attend the appeal

---

[17] UC Davis's rules provide that "all evidence, documentation, or suggestions of witnesses should be offered to the investigator prior to the conclusion of the investigation." The appeal hearing officer found that John knew that Jane alleged she was incapacitated due to the effects of alcohol, and he could have sought expert opinion on the issue during the investigation. Thus, she determined, "Dr. Lage's report is not new information that was unavailable at the time of the investigation."

hearing, and Jane told the hearing coordinator that she would not participate.

The appeal hearing was held on August 27, 2018. John was present with an advisor (an attorney) and a support person. John made opening and closing statements, and the hearing officer asked questions of John, Lilliedoll, and Dudley.

On September 13, 2018, the parties were sent notice of the appeal hearing officer's 14-page written decision. The Appeal Officer upheld the findings of the original decision and modified the sanction, setting aside the dismissal and imposing a two-year suspension from the University of California and exclusion from University housing instead.

On September 20, 2018, John submitted a second-level appeal, appealing the appeal hearing officer's decision. On October 10, 2018, the Associate Vice Chancellor of Student Affairs denied the second-level appeal.

H.  *Petition for Writ of Administrative Mandate*

On February 21, 2019, Doe filed a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) (§ 1094.5) and declaratory relief (Civ. Code, § 1060). He argued the proceedings were unfair because a single person (Lilliedoll) investigated the allegations and determined the facts and because he was denied an opportunity to cross-examine Jane and adverse witnesses in a live, adversarial setting before a neutral factfinder. John relied primarily on *Allee, supra*, 30 Cal.App.5th 1036. John also argued Lilliedoll lacked impartiality and substantial evidence did not support the factual finding that Jane was incapacitated.

The trial court denied the petition.

## DISCUSSION

A.   *Standard of Review*

A University of California student may challenge a disciplinary sanction of suspension or expulsion by a petition for writ of administrative mandate.  (E.g., *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1058, 1070 (*UCSD*) [student petitioned for writ of administrative mandate to challenge his suspension from UC San Diego for one year and one quarter after he was found to have digitally penetrated a classmate without her consent]; *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1267, 1270 [UC San Diego student petitioned for writ of administrative mandate to set aside his two-quarter suspension for hitting another student]; *Goldberg v. Regents of University of Cal.* (1967) 248 Cal.App.2d 867, 870, 873–874 [noting mandate was the appropriate remedy where UC Berkeley students challenged on First Amendment grounds their suspensions and dismissals for student conduct violations].)

To prevail, a petitioner seeking a writ of administrative mandate must show the agency (in this case, UC Davis) (1) acted without, or in excess of, its jurisdiction, (2) deprived the petitioner of a fair administrative hearing, or (3) committed a prejudicial abuse of discretion.  (§ 1094.5, subd. (b); *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*USC I*) [section 1094.5's "fair trial" requirement means there must be a fair administrative hearing].)[18]  " 'Abuse of discretion is established if the

---

[18] John contends he was denied a "fair process."  The fair administrative hearing protected under section 1094.5 is sometimes referred to as "fair process" (e.g., *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1014; *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1228 (*USC II*) or "fair procedure" (e.g., *USC I, supra*, 246 Cal.App.4th at p. 240; *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1445.)

[agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' " (*Ibid.*; see *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169.)

When, as here, an administrative decision does not involve a fundamental vested right, the trial court reviews the record to determine whether the findings and decision are supported by substantial evidence.[19] (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1057.) We review the agency's decision, rather than the trial court's decision, applying the substantial evidence standard. (*Id.* at p. 1058.)

When reviewing a claim that a petitioner did not receive a fair hearing, we uphold the trial court's decision if it is supported by substantial evidence, but when the evidence is substantially undisputed, the issue becomes a question of law, which we review de novo. (*Pinheiro v. Civil Service Com. for County of Fresno* (2016) 245 Cal.App.4th 1458, 1464; see *Clark v. City of Hermosa Beach*, *supra*, 48 Cal.App.4th at pp. 1169–1170.)

B.    *Fair Process*

        1.    <u>Legal Principles</u>

Generally, a fair process requires notice of the charges and an opportunity to be heard. (*USC I*, *supra*, 246 Cal.App.4th at p. 240.) " 'At the very minimum, therefore, students facing suspension . . . must be given some kind of notice and afforded some kind of hearing.' " (*Ibid.*, quoting *Goss v.*

---

[19] John does not claim his suspension in this case substantially affected a fundamental vested right. (See *USC II*, *supra*, 29 Cal.App.5th at p.1231 ["[a] university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right"].)

*Lopez* (1975) 419 U.S. 565, 579 (*Goss*).)[20]  Further, "a university is bound by its own policies and procedures." (*UCSD, supra*, 5 Cal.App.5th at p. 1078.) Due process requires a "university's procedures [to] ' "be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' [citation] . . . to insure that they are given a meaningful opportunity to present their case." ' " (*Ibid*.)[21]

Beyond these standards, however, it is safe to say the law is in flux regarding what procedures are required for student disciplinary proceedings involving allegations of sexual misconduct at colleges and universities.  Such proceedings do not require "all the safeguards and formalities of a criminal trial," and a university " 'is not required to convert its classrooms into courtrooms.' " (*UCSD, supra*, 5 Cal.App.5th at p. 1078.)  But the recent trend

---

[20] In *Goss*, the United States Supreme Court held, in the context of temporary suspensions from public high school, that "some kind of notice" and "some kind of hearing" were required under the federal Due Process Clause.  (419 U.S. at p. 579.)  The court contemplated that the hearing would often be no more than an informal discussion about the alleged misconduct between the school disciplinarian and the student "minutes after [the alleged misconduct] has occurred" where the student would be given "an opportunity to explain his version of the facts." (*Id*. at p. 582.)

[21] In the introduction to his opening brief, John asserts the administrative proceeding did not comply with due process.  But in his legal argument, he does not differentiate between "fair process" and "due process," and in *Allee*, the case on which John's appeal primarily depends, the court observed, "For practical purposes, common law requirements for a fair disciplinary hearing at a private university mirror the due process protections at public universities." (*Allee, supra*, 30 Cal.App.5th at p. 1061.)  Since John never argues due process requires greater procedural protections than he is due under his right to "fair process," there is no separate due process claim for us to consider.  That is, John's due process claim succeeds or fails to the extent his fair process claim succeeds or fails.

25

has been to expect more adversarial and criminal-trial-like procedures when a student is accused of sexual misconduct.

Previously, for example, in April 2016, Division Four of the Second District Court of Appeal recognized in *USC I* that not every administrative hearing required the accused be given the opportunity to confront and cross-examine witnesses, noting " 'the pure adversary model is not entitled to constitutionally enshrined exclusivity as the means for resolving disputes in' " administrative proceedings. (*USC I*, *supra*, 246 Cal.App.4th at pp. 244–245.) The court further observed that "cross-examination is especially fraught with potential drawbacks" "[i]n administrative cases addressing sexual assault involving students who live, work, and study on a shared college campus." (*Id.* at p. 245.)

Only seven months later, however, Division One of the Fourth District held in *UCSD* that when the "findings are likely to turn on the credibility of the complainant, and [the] respondent faces very severe consequences if he is found to have violated school rules, . . . a fair procedure requires a process by which the respondent may question, if even indirectly, the complainant." (*UCSD*, *supra*, 5 Cal.App.5th at p. 1084.) In that case, the court approved a procedure under which the accused student was permitted to submit written questions, which a panel then asked of the complainant. (*Id.* at pp. 1084–1085.)

In August 2018, Division One of the Second District held in *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1070, that "where the accused student faces a severe penalty and the school's determination turns on the complaining witness's credibility," "the complaining witness must be before the finder of fact either physically or through videoconference or like technology to enable the finder of fact to assess the complaining

26

witness's credibility in responding to its own questions or those proposed by the accused student."

Then in January 2019, Division Four of the Second District (the panel that, less than three years earlier, recognized cross-examination and an adversarial process were not necessary components of fair process) imposed additional procedural requirements in *Allee, supra*, 30 Cal.App.5th 1036.

The *Allee* court held, "when a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation, fundamental fairness requires, at a minimum, that the university provide a mechanism by which the accused may cross–examine those witnesses, directly or indirectly, at a hearing in which the witnesses appear in person or by other means (e.g., videoconferencing) before a neutral adjudicator with the power independently to find facts and make credibility assessments.  That fact finder cannot be a single individual with the divided and inconsistent roles [of investigator and fact finder]." (*Allee, supra*, 30 Cal.App.5th at p. 1069.)[22]

### 2.    Procedures Required

John contends UC Davis denied him a fair process because he did not receive a live hearing at which he could cross-examine witnesses and where the fact finder was not also the investigator.

_____

[22] In *Allee*, the investigator also found facts as Lilliedoll did in this case. (*Allee, supra*, 30 Cal.App.5th at p. 1069.)  Previously, courts recognized, "Overlapping investigatory, prosecutorial and adjudicatory functions do not necessarily deny a fair hearing and are common before most administrative boards." (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1142; *USC II, supra*, 29 Cal.App.5th at p. 1235, fn. 29 [quoting *Hongsathavij*].)

As a preliminary matter, respondent argues John forfeited this claim because he never requested the opportunity to conduct live cross-examination and never objected to any aspect of the Procedures during the administrative proceeding. (See *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 787 [due process claim was forfeited where the claim was not raised at the administrative hearing]; *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 548–549 [claim that a hearing was unfair because an entity acted as both prosecutor and adjudicator was forfeited where the claim was not raised at the administrative hearing].) John responds that he did raise the issue of cross-examination when he argued in his administrative appeal that Lilliedoll failed to ask witnesses relevant questions and failed to investigate Jane's potential motives to fabricate her complaint. We need not decide whether John's claim was forfeited, however, because we conclude the claim fails on the merits.

Here, the investigation, disciplinary decision, and administrative appeals in this case took place in 2018, before the *Allee* decision was filed. John petitioned the trial court for a writ of administrative mandate a month after *Allee* came out. John argued below that UC Davis denied him a fair process relying on *Allee*.[23]

_____

[23] We assume without deciding that *Allee* was correctly decided and that its holding applies to university adjudications that occurred before the decision came out. However, in 2020, the Legislature passed Senate Bill No. 493 (2019–2020 Reg. Sess.), which added section 66281.8 to the Education Code. Subdivision (g)(1) of the statute provides (effective January 1, 2021), "Any case law interpreting procedural requirements or process that is due to student complainants or respondents when adjudicating complaints of sexual or gender-based violence, including dating or domestic violence, at postsecondary educational institutions in the State of California shall have no retroactive effect." (Ed. Code, § 66281.8, subd. (g)(1).) The question of

The trial court denied the petition, reasoning that the procedures prescribed in *Allee* were not required in John's case because the determination of credibility was not "central" to the disciplinary decision. The court, considering only undisputed facts and resolving all disputed facts in favor of John, found that "[n]o reasonable person who witnessed what John Doe admitted to seeing could think that Jane Roe had the capacity to consent to sex, even after a few hours to sober up." We likewise conclude that credibility was not central in this case.

The university found Jane was incapacitated due to alcohol and was therefore unable to give consent. The UC Policy provides that an accused student's belief that there was consent does not establish consent where "a reasonable person should have known that the Complainant was unable to consent because the Complainant was incapacitated in that the Complainant was . . . due to the influence of . . . alcohol . . . unable to understand the fact, nature, or extent of the sexual activity."

John argues this is a "he-said-she-said" case, implying that he and Jane gave materially contradictory accounts of the incident. But they did not. As John describes in his opening brief, he "provided a complete account of what occurred in the room and also provided detailed information about [Jane]'s intoxication that was against this own interest" and Jane "did not refute [his] account." John emphasizes the numerous assurances he sought from Jane, but, in the end, what matters is that the evidence provided by John was sufficient to establish that she was incapacitated due to alcohol at the time

Senate Bill No. 493's effect on court review of university disciplinary proceedings is currently pending before our Supreme Court in *Boermeester v. Carry*, review granted and ordered not to be published, September 16, 2020, S263180.

and that a reasonable person in John's position should have known that. And this is squarely a violation of the UC Policy.

To recap John's account, he knew Jane was drinking and thought she had about six drinks. Jane started "hammering drinks an hour or so before she started puking." John found her "purging" in the bathroom, and she was sometimes slouched over with her head in the toilet bowl. At one point, she was lying on the bathroom floor, and John thought she might be choking. She was slurring and speaking "hazily." He described her as "gasping frantically and groaning" from pain in the bathroom. She spent at least 30 minutes there and fell asleep on the bathroom floor at least twice. Later, in her own bed, Jane drooled and made gurgling noises, and she was in such a state that John thought it was a good idea to watch her to make sure she fell asleep safely. He put a trash can by her bed in case she vomited. Later, she had a "shivery, fluttery voice" and, even later, she was groaning loudly. He got in bed with her, and when she initiated sexual activity with him, she seemed like she was just waking up. Later, after they had been having sex for a while, Jane talked about an activity she had the next morning and "she seemed to have gotten back to herself."

Indeed, John has acknowledged that the circumstances look bad. He wrote to the appeal hearing officer, "I understand how, at first glance, you could think this case is easy: [Jane] and I and had sex after she got so drunk that she threw up. So surely she must have been too drunk to consent to sex—case closed."[24] And, more significantly, he acknowledged, "[A]lmost all of what you know about that night—almost all of the evidence Ms. Lilliedoll

_____

[24] John went on to tell the appeal hearing officer that the case was not so simple because Jane initiated the sexual activity and he "asked her over and over again if she was sober enough to know what she was doing and if she was sure she wanted to do it." (Italics omitted.)

cited in her analysis—comes from information that I provided." Thus, for example, Lilliedoll found, "A reasonable person in [John]'s position who felt that [Jane] was not in a condition where she could safely sleep in her own bed unsupervised would have understood that she was unable to consent to sexual activity." This finding is based solely on John's account of events.

On this record, we conclude John's account alone was sufficient to establish that Jane was unable to consent due to alcohol and that a reasonable person in John's position should have known that. As a result, we further conclude credibility was not central to the adjudication and, consequently, the procedures outlined in *Allee* were not required.

3.     <u>Fairness of the Investigation</u>

Next, John contends Lilliedoll failed to conduct a fair, thorough, and impartial investigation as required by the Procedures. He makes two arguments in support of this contention.

First, John argues Lilliedoll rejected theories put forth by John that Jane had a motive to fabricate her allegations. But Lilliedoll explained her reasons for accepting Jane's explanation for why she submitted a complaint, and those reasons were not unfounded. Moreover, during the investigation, Lilliedoll sent John summaries of all the interviews and invited him to suggest further avenues of investigation. In response, John submitted over 20 follow-up questions for Jane, but none of them addressed possible motives to fabricate. John had a right to an impartial investigator; he did not have a right to have all his theories accepted.

He also complains that Lilliedoll found he "had a motive to exaggerate the evidence of consent because there are serious consequences associated with violating the [UC P]olicy." While this statement in isolation might be concerning, Lilliedoll elaborated that, soon after the incident, John expressed

31

worry to his good friend, Witness C, and indicated he was not sure whether the sexual encounter was consensual or whether Jane was in the right state of mind. Yet, according to Witness C, John did not mention in this conversation that Jane repeatedly gave verbal consent to sexual activity. Of course, we would not generally expect a college student recounting a sexual encounter to a friend to describe every statement of the other person's consent, but it was not unreasonable for Lilliedoll to determine that, in the context of a conversation discussing concern that a sexual encounter might not have been consensual, John likely would have mentioned that Jane said she was sober and repeatedly consented to sexual activity if that had happened.

Second, John claims Lilliedoll uniformly rejected or discounted evidence that was favorable to him. He points out that the appeal hearing officer agreed with him that Lilliedoll should have considered that Jane had a boyfriend as a motive to lie and that she gave unjustified weight to what John said to his friends about how sexual contact was initiated. But the appeal hearing officer also found that no alleged procedural error affected the outcome, that the record showed "Lilliedoll thoroughly considered the evidence, statements provided by the parties, and witnesses testimony in reaching her findings," and that Lilliedoll considered John's account as well as other evidence in determining that Jane was incapacitated.

Here, the trial court found, "Lilliedoll offered the students transparency in her investigation, influence on its direction, and opportunities to correct any errors. She documented the evidence that she relied on, provided that evidence (including interview summaries) to both John Doe and Jane Roe for comment, and allowed both students to propose follow-up questions to each

32

other and other witnesses." Whether our review is for substantial evidence or de novo, we agree with the trial court.

The record shows Lilliedoll did not simply accept Jane's version of events, nor did she treat this as an open and shut case. Instead, she interviewed John and other students from the residence hall. Some of the witnesses were Jane's friends (Witness A, Witness B), but others (Witness C, Witness E) were closer to John. Lilliedoll collected access card swipe data for the residence hall for all the witnesses as well as dining services card swipe data. She also requested security camera footage for the residence hall, looking for first floor activity outside the gender-neutral bathroom and Jane's room, but no video was available.

Lilliedoll interviewed John in person on April 12, 2018. She then provided him a summary of the interview, inviting him to clarify or correct the summary. John provided comments and clarifications on April 22, which Lilliedoll incorporated in her evidence summary. On May 2, Lilliedoll provided John a summary of all the evidence collected in her investigation, inviting him to "suggest additional information you believe I should pursue." John gave Lilliedoll his own written summary of events, a written response to the evidence, and follow-up questions for Jane and Witness A. In response to John's suggested questions, Lilliedoll followed up with Jane in person and followed up with Witness A in writing.

This record does not support John's claim that the investigation was anything other than fair, thorough, and impartial. John was given ample opportunity to explain his version of the facts, and we cannot say the process he received was unfair.

C.   *Substantial Evidence*

Finally, John argues no substantial evidence supports Lilliedoll's finding that Jane lacked capacity.  He relies on his own account that Jane assured him she was sober when she consented to sex and toxicologist Lage's letter.  But, again, what Jane may have said to him is not determinative.  The issue is whether there was substantial evidence to support a finding that Jane was incapacitated due to alcohol at the time of the sexual activity and that a reasonable person in John's position should have known that.  John's own account of Jane's state that night and the accounts of eyewitnesses provide substantial evidence of Jane's incapacity.[25]

As for Lage's letter, we cannot fault Lilliedoll for not considering expert evidence that she was not provided.  In any event, the general tenor of John's argument appears to be that if a student has sex with a person who is visibly impaired by intoxication and the person later cannot remember what happened, then the accused student's version of events, including his subjective beliefs, must be adopted and lack of consent under UC Policy cannot—as a matter of law—be established by circumstantial evidence of the person's incapacity.  We decline to adopt such a position.

## DISPOSITION

The judgment is affirmed.

---

[25] Recall that, in his line-by-line response to Witness A's interview, John did not dispute Witness A's description of Jane as stumbling and unable to talk when she returned to her room from the bathroom.

34

_____

Miller, J.

WE CONCUR:


_____

Kline, P.J.


_____

Richman, J.


A159004, *Doe v. The Regents of University of California*

Filed 10/19/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN DOE,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE<br>UNIVERSITY OF CALIFORNIA,<br><br>     Defendant and Respondent. | A159004<br><br>(Alameda County<br>Super. Ct. No. RG19007666) |

BY THE COURT:

      The opinion in the above-entitled matter filed on September 30, 2021, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____      _____

                                                         Kline, P.J.

Court:  Alameda County Superior Court

Trial Judge:  Hon. Frank Roesch

Hathaway Parker Inc., Mark M. Hathaway, Jenna E. Parker, for Plaintiff and Appellant

Venable LLP, Jean-Paul P. Cart, for Defendant and Respondent

A159004, *Doe v. The Regents of the University of California*